[Civ. No. 5036. Fourth Dist. Nov. 1, 1955.]

HENRY C. RIDLEY, Respondent, v. GRIFALL TRUCKING COMPANY et al., Appellants.

William W. Shaw for Appellants.

Margolis, McTernan & Branton and Richard M. Anderson for Respondent.

GRIFFIN, J.—In this action plaintiff and respondent, a workman at the Kaiser Steel plant, brought this action against defendants and appellants Grifall Trucking Company and Ralph Sween, the driver of a large tractor-semitrailer, to which was attached a big four-wheel trailer. It was owned by defendant company. On June 20, 1950, defendant driver left Salinas with the truck and trailers loaded to capacity with dolomite. The gross weight was 76,000 pounds. About 19,000 pounds were on the semitrailer and it was estimated that there was about 9,000 pounds on each wheel of it. On each of the dual wheels of the semitrailer were two pneumatic tires, size 11.00 x 22. The loaded truck was driven into the hearth department of the mill where 30 to 40 employees, in-

cluding plaintiff, were working. In the course of spotting the load of dolomite it became necessary for the driver to detach the full trailer on the open hearth floor and then to maneuver the truck out on the high line in order to turn it around. That area was "littered with rocks." While the truck was being maneuvered in the rocky area and moving slowly, a rear tire on the seimtrailer blew out with an enormous blast sounding like a charge of dynamite or TNT. It shook the entire building. Dust was raised by the explosion and a jagged rock larger than one's fist was thrown through the air and struck plaintiff's leg, resulting in considerable damage and loss of wages and earning capacity. He was about 50 feet distant to the rear of the semitrailer at the time. A trial by jury resulted in a verdict of $20,000 for the plaintiff.

Plaintiff's theory of negligence on the part of defendants is: (1) The defective condition of the tire caused by its having been worn through to the fabric; (2) Driving the truck over rocks large enough to cause blowouts; and (3) Maintaining and operating the tire with excessive air pressure, all under the circumstances related. Defendants' claim on appeal is that the evidence is insufficient to support these claims or the verdict, and that the judgment is excessive.

As to the defective condition of the tire, there was testimony of plaintiff's witnesses that they inspected the tire after the explosion and it was "thread-bare . . . mostly all canvas showing the whole surface of the tire, the road surface"; that the side walls were "cracked," "scuffed" and "gouged"; and that the blowout occurred on the road surface of the tire. This testimony, to some extent, was contradicted by defendants. The tire was removed at an oil station nearby and was discarded by defendants. Accordingly, it was not available as evidence at the trial. Upon the appeal it will be presumed that the jury resolved the conflict favorably to the plaintiff in respect to the condition of the tire. (*Juchert* v. *California Water Service Co.*, 16 Cal.2d 500 [106 P.2d 886].)

As to the driving of such a tire over rocks, under the conditions indicated, plaintiff's witnesses testified that the area over which the driver drove this truck was paved and littered with rocks and some were quite "jagged," and that although it was at nighttime, the place was illuminated. The driver admitted that he saw rocks in that area and that he ran over a rock with the back axle of the semitrailer and it blew out the left outside tire on the semitrailer. He stated that

he had been driving similar trucks for nine years and knew that blowouts were "caused with some frequency" as a result of driving equipment over rocks of that size and shape, and that the customary precaution was to see that no rocks were in the way. He said he tried to drive where the least of these rocks were but made no request of anyone at the plant to have them removed.

Defendant Grifall testified that any tire may blow out if it hits a rock even when brand new; that if a tire has been recapped it is more likely to blow out; that his practice was to recap them as much as four or five times depending on the advice of the recapper; and that the more times a tire is recapped the greater the chances are that it will blow out. He said he could not say from the company record, or his recollection, whether the tire in question was recapped, and that he gave specific instructions to his drivers to avoid "driving over a rocky place" and that if they "can't watch it, to have somebody watch for" them. As to maintaining and operating a tire with excessive air pressure the evidence is that 11.00 x 22 truck tires are rated by the manufacturer for a maximum load of 4,750 pounds and a maximum pressure of 70 pounds; that the tire was inflated to 80 pounds at the start of the trip but defendants claimed that it was recommended more economical to inflate them to 80 pounds. There was evidence that the effect of the travel on such a tire for the distance here indicated, with the load weight shown, would be to build up the air pressure from 5 to 8 pounds.

Considerable evidence was taken in reference to the explosive force of a truck tire of the size here involved under an air pressure of 70 pounds. The cubic capacity of such a tire was computed at 7,400 cubic inches and it was stated that 70 pounds of air pressure in a tire means 70 pounds of pressure per square inch of the internal surface of the tire, and this pressure approximates that released by the explosion of 2/3 of a pound of TNT, a very high explosive.

It is defendants' claim that even in view of this testimony there was no proof that the driver of the truck could or did foresee, from the facts related, that an injury of some sort might be anticipated or that the probability of such an injury was reasonably foreseeable; that the fact that the tire was inflated to 80 pounds was not unusual or negligence in itself because the testimony shows that an operator of a truck can run it over or below that pressure and no blowout would

result; that the tire did not blow out from overinflation but because it came in contact with a rock; that although the driver did drive into an area where rocks were strewn on the pavement, this would not necessarily charge him with knowledge that a blowout might occur and that the injury indicated would result; that neither defendant ever heard of a blowout throwing a rock and causing such an injury; that neither had any knowledge of *physics* and did not know the foot pounds of energy in that size tire; and that since Grifall inspected the tires before they left on the trip and found no tread showing, ordinary care was used in the management of defendants' property, citing such authority as *Johnson* v. *Union Furniture Co.*, 31 Cal.App.2d 234 [87 P.2d 917]; 19 Cal.Jur. p. 562, § 13; and Prosser on Torts, chap, VI, p. 220, which states:

"The idea of risk necessarily involves a recognizable danger, based upon some knowledge of the existing facts, and some reasonable belief that harm may follow. A risk is a danger which is apparent, or should be apparent, to one in the position of the actor. The culpability of the actor's conduct must be judged in the light of the possibilities apparent to him at the time, and not by looking backward 'with the wisdom borne of the event.' The standard must be one of conduct, rather than of consequences."

█ From the evidence produced the jury might well have believed that all three of the claimed acts of negligence were established and that defendants knew, or as reasonable men should have known, that the faulty condition of the tire, operated with excessive air pressure and being driven over large jagged rocks on a hard pavement, loaded as it was, might, under these conditions, blow out. While a blowout on the road under these conditions might not be dangerous to others, yet when one drives such a truck, under the conditions described, in and about a mill where workmen are employed, a different result may obtain. █ The element of danger and possibility of injury to others should become more apparent to such driver. Full instructions on the question of foreseeability of an injury were given to the jury by both plaintiff and defendants. (*Osborn* v. *City of Whittier*, 103 Cal.App.2d 609 [230 P.2d 132].) The mere fact that a particular kind of an accident has not happened before does not, under all circumstances, show that such accident is one which might not reasonably have been anticipated. (*Cox* v. *Central Calif. Traction Co.*, 85 Cal.App. 596 [259 P. 987];

*Sander* v. *Los Angeles Ry. Corp.*, 38 Cal.App. 222 [175 P. 901].)

█ The only other question is the claim that the judgment was excessive and not supported by the evidence. The medical testimony shows (1) Comminuted fracture of the right femur; (2) Surgery and plating to reduce the fracture and secure the required alignment of the bone; (3) Encasement in a full spica cast from armpits to the right foot and left knee with his legs held apart by a bar fixed into the cast. Plaintiff spent over three months in this cast during the "terribly hot" season at Fontana, plagued by hives, hair cuttings and perspiration, all inside the cast. This confinement produced "melancholy" by day and nightmares by night. He required frequent and regular sedation for his nerves. (4) Following release from his cast plaintiff underwent a course of physical therapy lasting from October, 1950 to about the middle of 1953. From the time the cast was removed he had constant pain in his leg which required the use of analgesics until about six months before trial in December, 1953. (5) Plaintiff was able to get around only on crutches for a period of over three months after the cast was removed and thereafter he required a walking stick for some time. As late as January 9, 1951, when he returned to work, he was able to walk no more than one half a block, and this left him "all petered out"; (6) His permanent injuries are stated to be shortening of the right leg by two centimeters; weakening of the right leg to approximately half the strength of the left; 50 per cent loss of flexion in the right knee; complete loss of dorsiflexion in the right ankle; claudication of the soft tissue of the right leg; incurable pain in the right calf, thigh and the low back whenever he stands or walks for as much as half a block; and (7) Loss of earnings of $1,885. In addition, one doctor testified he was not fitted to stand or walk for substantial periods of time without having disabling pain, and that he was between 25 per cent and 33⅓ per cent occupationally disabled. He was 53 years old when he returned to work and had a life expectancy of 20 years. He grossed about $84 per week.

It is defendants' contention that on plaintiff's return to work he suffered no actual loss of earnings at the plant and accordingly suffered no loss of earning power. They rely upon the testimony of the same doctor who testified for plaintiff when, on cross-examination, he said that in his opinion, as to the extent of plaintiff's occupational disability, he was

"wrong" if Ridley "did some type of work for a year and no allowances were made for him." It appears that plaintiff went to work at the same rate of pay and received general wage increases thereafter, but when he was hurt he was classified as an "ingot stocker," which required considerable walking in connection with his work. On his return the management allowed him to keep his same classification but confined his services to weighing at the scales where he did not have to walk or lift anything as before. Other duties previously performed by him were assigned to other employees, and the data required by him was brought to him by them. It is apparent that he was unable to do the same type of work that he had been doing prior to the injury. He held the same job mainly because his inability to perform the required job operations was tolerated by his employer. Apparently, his occupational disability otherwise remains unaffected. Defendants offered no contrary medical testimony.

■ Loss of earning power is an element of general damages which can be inferred from the nature of the injury, without proof of actual earnings or income either before or after the injury. Damages in this respect are awarded for the loss of ability thereafter to earn money. (*Storrs* v. *Los Angeles Traction Co.*, 134 Cal. 91, 93 [66 P. 72].) ■ This principle applies where there is no evidence at all that the plaintiff was ever gainfully employed. (*Lang* v. *Barry*, 71 Cal.App.2d 121, 126 [161 P.2d 949].) Evidence of actual earnings before or after injury merely assists the jury, as persons of ordinary intelligence and experience, in arriving at the amount of the award which it is in their power to determine from the nature of the injury. (*Lang* v. *Barry, supra*; *Ostertag* v. *Bethlehem Shipbuilding Corp.*, 65 Cal. App.2d 795, 805 [151 P.2d 647].)

■ In addition to the finding of the jury in this respect the trial court also considered this question on a motion for new trial and denied it. Its conclusion in this regard is persuasive in determining whether the verdict was based on passion or prejudice. (*Roedder* v. *Rowley*, 28 Cal.2d 820, 823 [172 P.2d 353]; *Hellman* v. *Los Angeles Ry. Corp.*, 135 Cal.App. 627, 643 [27 P.2d 946, 28 P.2d 384].)

We conclude that the damages awarded are within reasonable and permissible limits.

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.