[No. B047481. Second Dist., Div. Seven. Sept. 30, 1991.]

CASSONDRA HEGYES, a Minor, etc., Plaintiff and Appellant, v. UNJIAN ENTERPRISES, INC., Defendant and Respondent.

**COUNSEL**

David M. Harney and Thomas Kallay for Plaintiff and Appellant.

Haight, Brown & Bonesteel, Michael J. Bonesteel, Robert L. Kaufman and Rebecca D. Wynn for Defendant and Respondent.

**OPINION**

WOODS (Fred), J.—Appeal from a judgment of the Los Angeles County Superior Court, the Honorable Robert P. Schifferman, judge presiding, dismissing the action of plaintiff/appellant following the sustaining of a demurrer to the complaint without leave to amend. We affirm.

## I.

### INTRODUCTION

Minor plaintiff, Cassondra Hegyes, appeals from a judgment entered after the court below sustained defendant's demurrer to her complaint for preconception negligence. In 1985, plaintiff's mother and guardian ad 'litem, Lynn O'Hare Hegyes, was involved in a car accident with a vehicle driven by defendant's employee. She sued defendant for injuries she sustained as a result of that accident and settled that action. Two years later she became pregnant and, subsequently, gave birth to plaintiff, who was born prematurely and allegedly suffers from injuries relating to premature birth.

Plaintiff now claims that the negligent conduct of employees of defendant caused her injuries and seeks damages therefor. Defendant demurred on the ground that no legal duty existed under the alleged facts. The trial court agreed, finding that recognition of plaintiff's claim would constitute an unwarranted extension of the duty of care. Accordingly, defendant's demurrer was sustained without leave to amend, and a judgment of dismissal was entered. It is from that judgment that plaintiff appeals.

## II.

### STATEMENT OF FACTS

#### A. *The Complaint*

On January 24, 1989, plaintiff Cassondra Hegyes (hereinafter Hegyes or plaintiff) filed her complaint and commenced this negligence action against defendants Donald Wayne George, Office Supply Company, and Unjian Enterprises, Inc. In that complaint, she alleged that the corporate defendant, Unjian Enterprises, Inc., doing business as Office Supply Company (hereinafter defendant), was the owner of a passenger vehicle involved in an automobile accident on July 4, 1985, while it was being operated by defendant's employee, Donald George.[1] Lynn O'Hare Hegyes (hereinafter O'Hare) was allegedly injured in that accident. It is claimed that, as a result of that accident, O'Hare was fitted with a lumbo-peritoneal shunt.

In 1987, O'Hare became pregnant with plaintiff. During that pregnancy, the fetus compressed the lumbo-peritoneal shunt and, in order to avoid further injury to O'Hare,[2] plaintiff was delivered 51 days premature, by

---

[1] Mr. George has never been served with the complaint.

[2] In her complaint, her opposition to the demurrer, and in oral argument before the trial court, plaintiff stated that the growing fetus threatened O'Hare's well-being, not plaintiff's. The complaint specifically states that the premature Cesarean section was performed to "protect the life of [O'Hare]." No *in utero* injury to plaintiff has ever been claimed.

Cesarean section on October 31, 1987. Plaintiff alleged that the personal injuries she sustained were a proximate result of the negligence of defendants.

B. *The Demurrer*

On or about November 1, 1989, defendant served its demurrer to plaintiff's complaint. That demurrer included a request that the court take judicial notice of the complaint (case No. NCC029844B) that O'Hare had filed on June 6, 1986, in Los Angeles Superior Court, pertaining to the same automobile accident that is the subject of plaintiff's complaint in the instant action. According to defendant, O'Hare's suit was settled before plaintiff's case was filed, and defendant was released from liability for the injuries to O'Hare allegedly now giving rise to plaintiff's lawsuit (i.e., the placement of the lumbo-peritoneal shunt).

Defendant's demurrer challenged the sufficiency of plaintiff's complaint on several grounds, one of which was the absence of any legal duty of care. Defendant contended that no legal duty was owed by defendant to plaintiff under the facts presented since claims for preconception negligence involve a special "physician-patient" relationship which gives rise to a duty to the subsequently conceived "foreseeable" fetus. In the absence of such a special relationship, defendant contended that a legal duty had never been found under California law.

Defendant also claimed that plaintiff's injuries were not reasonably foreseeable.

Finally, defendant asserted that the complaint failed to state facts sufficient to constitute a cause of action for negligence or negligence per se. Defendant noted that the word "duty" appeared nowhere in plaintiff's complaint and that no facts establishing a legal duty were alleged. Defendant further argued that plaintiff was not in the class of persons sought to be protected through enactment of the *Vehicle Code.*

On November 22, 1989, plaintiff filed her opposition to defendant's demurrer. In that opposition, plaintiff contended that "a cause of action may be maintained by [plaintiff] as against [defendants]."

The opposition raised briefly the issue of foreseeability, and argued that a minor plaintiff may maintain an action for preconception negligence, but did

not address the absence of authority for such preconception negligence actions against third parties who did not bear a "special relationship" to plaintiff. Plaintiff did not attempt to join issue on the question of defendant's duty or lack thereof.

On or about November 28, 1990, defendant served its response to plaintiff's opposition. In that response, defendant noted plaintiff's failure to distinguish the present case from those for preconception professional negligence or product liability, where there existed a "special relationship" between the parties. Defendant emphasized that, absent such relationships, courts had not found the existence of a legal duty owed by a defendant to a later conceived plaintiff.

## C. *The Trial Court's Ruling*

On December 1, 1989, defendant's demurrer was heard. The court read and considered the opposition, which had conceded that "this is a case of first impression."

While plaintiff requested leave to amend, no new or different "facts" or allegations were cited by plaintiff in response to the court's specific inquiry regarding how or in what fashion plaintiff would amend the complaint.

After considering the arguments of counsel, the trial court sustained the demurrer without leave to amend on the ground that recognition of such a cause of action would "be an unwarranted extension of a duty of care."

## D. *The Judgment and Appeal*

On December 19, 1989, the notice of entry of judgment was filed. Plaintiff filed a timely notice of appeal.

### III.

#### ISSUE ON APPEAL

This appeal presents a single issue, which may be framed as follows: Does a negligent motorist owe a legal duty of care to the subsequently conceived child of a woman who is injured in an automobile accident?

## IV.

### DISCUSSION

A. *The trial court correctly denied plaintiff leave to amend since it was evident as a matter of law that defendant owed plaintiff no legal duty of care.*

■ The function of a demurrer is to test the legal sufficiency of a pleading. (*Beauchene* v. *Synanon Foundation, Inc.* (1979) 88 Cal.App.3d 342, 344 [151 Cal.Rptr. 796].) In a case such as this one, where a demurrer has been sustained without leave to amend, the function of the appellate court is to determine whether there was clear error or abuse of discretion by the trial court. As stated in *Wilhelm* v. *Pray, Price, Williams & Russell* (1986) 186 Cal.App.3d 1324, 1330 [231 Cal.Rptr. 355]: " '[A]ll intendments weigh in favor of the regularity of the trial court proceedings and the correctness of the judgment. Unless clear error of abuse of discretion is demonstrated, the trial court's judgment of dismissal following the sustaining of the defendants' demurrer will be affirmed on appeal.' " The party asserting that there was an abuse of discretion has the burden of proof. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 331 [703 P.2d 58].)

■ Plaintiff in this case seeks damages for defendant's alleged preconception negligence. However, she has failed to allege or demonstrate that defendant owed her any duty of care and that her injuries were reasonably foreseeable. More telling, is that she has failed to show how any amendment would cure the defects in her pleading.

■ A complaint which lacks allegations of *fact* to show that a legal duty of care was owed is fatally defective. (*Jones* v. *Grewe* (1987) 189 Cal.App.3d 950, 954 [234 Cal.Rptr. 717].) ■ The existence of such a duty is properly challenged by demurrer and is a question of law for the court. (*Searcy* v. *Hemet Unified School Dist.* (1986) 177 Cal.App.3d 792, 798-799 [223 Cal.Rptr. 206]; *Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624].)

■ Here, the trial court correctly held that no legal duty of care existed. Plaintiff urges this court to recognize a novel approach to the tort of negligence, which abandons the concept of duty and works backwards from causation. We note that plaintiff did not raise a causation issue in the trial court. Even though plaintiff raises a causation issue for the first time on appeal, we are compelled to point out that the law is clearly to the contrary in that the existence or nonexistence of "duty" is the initial obstacle which must be mastered before any liability for negligence is legally permissible.

In the alternative, plaintiff argues in her opening brief on appeal that the trial court's decision may have been derailed by describing this case as a "wrongful life" case. We do not find such description to be totally without merit. "Wrongful life," as a judicially and statutorily recognized cause of action in this state, is the most analytically similar established cause of action to plaintiff's claim and, as such, was properly so examined by the trial court. Moreover, even if this be error, which we do not so declare, plaintiff invited the error and may not now try to benefit therefrom. Several times in the trial court, plaintiff, herself, analogized her case to those which seek damages for "wrongful life."

■ Generally speaking, a "wrongful life" case is brought by a genetically impaired child against a physician or other health care provider for preconception negligence in rendering medical counseling or testing. (*Turpin v. Sortini* (1982) 31 Cal.3d 220.) In a "wrongful life" case, the child does not assert that the negligence of the defendant *caused* the inherited or congenital abnormalities. The essence of the child's claim is that the medical professional's breach of the applicable standard of care resulted in that child being *born* to experience the pain and suffering attributable to his or her affliction. ■ In effect, the only true difference between the present case and the one for "wrongful life" lies in the damages sought, a discussion irrelevant to the issue of duty.

Admittedly, there have been localized and often inconsistent definitions of critical terms in preconception tort cases, leading to widespread confusion among legal commentators and the judiciary with respect to the classification of these claims. For example, plaintiff cites Prosser and Keeton, The Law of Torts (5th ed. 1984), section 55, page 367, which defines varying types of preconception tort claims. In particular, that treatise identifies "wrongful life" and "pre-conception" negligence resulting in prenatal injuries as two separate and distinct variations of preconception negligence. There is no support for application of that theory in California where our Supreme Court has opined that "wrongful life" is an appropriate and sufficient title to be attached to claims brought by infants for negligence occurring prior to their conception. (*Turpin v. Sortini, supra,* 31 Cal.3d at p. 225.)

In *Turpin*, the Supreme Court stated with respect to the multiple authorities attaching various titles to preconception tort claims: "While courts and commentators have not always been consistent in their terminology, 'wrongful life' has generally referred to actions brought on behalf of children, and 'wrongful birth' to actions brought by parents. Some authorities have broken these categories down further [citation], but in this opinion we will follow the general usage: 'wrongful life' for all actions brought by

children and 'wrongful birth' for all actions brought by parents." (*Id.*, at p. 225, fn. 4.)

To the extent it is unclear, it is unimportant whether this case should be called one for "wrongful life" or another of the various classifications given that claim by innumerable commentators, as the title of plaintiff's claim was not the basis for the trial court's ruling. ■ It is well established that the subject matter of, and issues in, an action are determined from the facts alleged, rather than from the title of the pleading. (*Buxbom* v. *Smith* (1944) 23 Cal.2d 535, 542 [145 P.2d 305].) The doctrine of "theory of pleading" has been repudiated in this state for over half a century. (*California W. S. L. Ins. Co.* v. *Tucker* (1940) 15 Cal.2d 69, 71 [98 P.2d 511].) ■ ■ ■ Moreover, as both sides obviously agree that plaintiff's claim sounds in negligence, the basic elements for such an action must be satisfied regardless of the title associated with plaintiff's theory of liability.[3]

■ Regardless of the title attached to plaintiff's theory of liability, the trial court correctly identified this as a negligence case and found there was no authority in this or any jurisdiction for imposing upon defendant a legal duty to plaintiff under the facts presented. Such a duty has never been found, nor has liability been imposed, in a preconception negligence case where defendant was not a medical professional or product liability manufacturer.[4] The finding of a legal duty in those instances has been said to be consistent with express state and public policy interests in preventing foreseeable injuries to fetuses conceived pursuant to a "special relationship." No similar interests can be validly asserted under the present facts.

B. *Absent professional negligence or product liability, no legal duty is imposed upon parties to protect subsequently conceived fetuses from injury.*

Plaintiff contends that a logical extension of the trial court's decision would preclude any and all children from recovering damages for preconception negligence. Appellant erroneously claims that, under the trial court's ruling, " 'defendant could owe no duty of conduct to a person who was not in existence at the time of his action.' " However, the record reflects that the

---

[3]The basic elements required for a negligence action in tort are similar to those required elsewhere. A plaintiff must establish that a duty of care was owed plaintiff by defendant; that the duty was breached; that the breach was the proximate cause of harm to plaintiff; and that plaintiff was in fact damaged. (See generally 4 Witkin, Cal. Procedure (3d ed. 1985) Pleading, § 527, pp. 558-559.)

[4]The product liability distinction is important, since, in those cases, once a defect in manufacture or design is established, or there has been a failure to give adequate notice of foreseeable potential hazards, the liability of the manufacturer arguably extends to the entire class of persons thereby affected, regardless of privity, foreseeability or due care.

trial court appropriately ruled that only when a legal duty to the subsequently conceived child is found to exist and to have been violated may liability for preconception negligence be imposed. Applying that proposition to the facts of this case, we conclude that the trial court properly found that defendant owed no legal duty to plaintiff.

In a preconception tort case, as in any negligence case, there is an overwhelming need to keep liability within reasonable bounds and to limit the areas of actionable causation by applying the concept of duty. In a non-medical preconception negligence case where there is no alleged "special relationship," it becomes more difficult to find a legal duty owed to the minor child and, hence, liability on the part of defendant. It cannot be said that, under the facts presented, defendant motorist owed a legal duty to plaintiff.

California has an illustrative history regarding preconception tort claims. Although terming them claims for "wrongful life," California does recognize the existence of a cause of action for damages sustained as a result of a defendant's preconception negligence. However, case law imposes liability only when there is a "special relationship" between the defendant and the mother giving rise to a *duty* to the minor plaintiff. The defendant's conduct in those cases is inextricably related to the inevitable future pregnancy, a key element missing from the present facts.

For example, the earliest California case in this area, *Custodio* v. *Bauer* (1967) 251 Cal.App.2d 303 [59 Cal.Rptr. 463, 27 A.L.R.3d 884], involved an action brought solely by the parents against a physician whose negligence in performing a sterilization operation failed to *prevent* the plaintiff's pregnancy and the birth of a healthy child, the family's tenth. The *Custodio* court, finding defendant doctors breached their duty of care, rejected defendants' contentions that "pregnancy, the ensuing birth of a child, and the costs and expenses of the delivery and rearing of a child, are not legally cognizable injuries" and held that ordinary tort principles of compensation for " 'all the detriment proximately' " caused should govern. (*Id.* at pp. 310, 325.) The decision left unresolved the issue of whether the healthy, albeit unplanned, child could successfully maintain a preconception negligence claim in her own right.

Similarly, in *Stills* v. *Gratton* (1976) 55 Cal.App.3d 698 [127 Cal.Rptr. 652], a judgment of nonsuit was held improper in an action based upon the negligent performance of a therapeutic abortion which *led to the birth* of an unwanted, but healthy child. As in *Custodio*, it was held that the mere fact that the child had been born healthy did not preclude the mother from recovering the usual damages which are recoverable under established tort

principles in the event the trier of fact found in her favor on liability. (*Id.*, at pp. 703-705, 709.) Notably, however, the court observed that the *normal* child born as a result of the failed abortion caused by defendant physician's negligence, had *no* independent cause of action for malpractice, as he sustained no cognizable damage in simply being born. (*Id.*, at pp. 705-706.) The issue of whether the defendant doctor owed the minor an independent legal duty of care was not addressed.

The following year, the appellate court decided *Dujardin* v. *Ventura County General Hospital* (1977) 69 Cal.App.3d 350 [138 Cal.Rptr. 20], wherein plaintiff became pregnant shortly after being prescribed an IUD, *resulting* in the premature birth of a handicapped child. The merits of plaintiffs' claims were not addressed since the issue on appeal involved the sustaining of a demurrer to plaintiff's complaint on grounds of failure to comply with the procedural requirements of the Tort Claims Act. The appellate court reversed, ruling that a belated discovery tolled the statutory time period within which to file a claim.

California then gained nationwide attention by the decision in *Curlender* v. *Bio-Science Laboratories* (1980) 106 Cal.App.3d 811 [165 Cal.Rptr. 477], wherein for the first time the court was faced with a genetically impaired child suing for preconception negligence. In California's first true "wrongful life" case, minor plaintiff suffered from Tay Sachs disease. It was alleged that the plaintiff's parents had specifically retained defendant, Bio-Science Laboratories, to administer certain tests in order to determine whether the parents were carriers of the Tay Sachs genes. In the complaint, it was alleged that these tests were performed negligently by defendant Bio-Science and that, as a direct result of that negligence, inaccurate and incorrect information was disseminated to plaintiff's parents concerning their status as carriers and specifically influenced them to conceive the plaintiff.

The *Curlender* court had no difficulty finding a duty owed to the minor plaintiff and that a cause of action for "wrongful life" was stated against defendant. It specifically recognized that society has an interest in ensuring that genetic testing is properly performed. (106 Cal.App.3d at p. 826.) The court cited with acceptance the following language form the Yale Law Journal: "The writer concluded that the law indeed has an appropriate function in encouraging adequate and careful medical practice in the field of genetic counseling, observing that '[t]ort law, a well-recognized means of regulating the practice of medicine, can be used both to establish and to limit the duty of physicians to fulfill this [genetic counseling] function.' " (*Ibid.*)

The court went on to state: "We have no difficulty in ascertaining and finding the existence of a duty owed by medical laboratories engaged in

genetic testing to parents and their as yet unborn children to use ordinary care in administration of available tests for the purpose of providing information concerning potential genetic defects in the unborn. The public policy considerations with respect to the individuals involved and to society as a whole dictate recognition of such a duty, and it is of significance that in no decision that has come to our attention which has dealt with the 'wrongful-life' concept has it been suggested that public policy considerations negate the existence of such a duty." (106 Cal.App.3d at p. 828.)

The court concluded that the afflicted child could maintain an action for "wrongful life." (106 Cal.App.3d at pp. 830-831.) Unlike *Stills*, wherein defendant's negligence led to the birth of a healthy, albeit unplanned, child who could not maintain an action for preconception negligence since he suffered no legally cognizable injury, in *Curlender* the minor plaintiff was afflicted with a genetic defect that defendant laboratories negligently failed to detect. Clearly, a legal duty was owed to the genetically impaired child foreseeably conceived *as a direct result* of defendant's negligence.

Subsequently, in *Turpin v. Sortini, supra,* 31 Cal.3d 220, the Supreme Court echoed the notion that a "wrongful life" cause of action could be maintained in California where a duty to a minor plaintiff was owed who was born totally deaf as a result of a genetic defect. It was alleged that defendant doctors had negligently failed to diagnose this genetic defect in her older sister and to advise the minor's parents of the probability of the hereditary condition, depriving them of the opportunity to choose not to conceive a child. According to the complaint, the nature of the condition was such that there was a "reasonable degree of medical probability" that the hearing defect could be inherited by any offspring of plaintiff's parents.

The Supreme Court in *Turpin* cited *Budd v. Nixen* (1971) 6 Cal.3d 195 [98 Cal.Rptr. 849, 491 P.2d 433] which summarized the basic elements of a professional malpractice action, which were to be applied in evaluating plaintiff's claim for "wrongful life" against the defendant physicians. Of those elements, duty, breach, and proximate cause *were not disputed* by the Turpin defendants. The court, therefore, focused on the existence and propriety of any "legally cognizable injury" resulting from the alleged negligence (consistent with the prior decisions of *Stills* and *Curlender*). (*Turpin v. Sortini, supra,* 31 Cal.3d at pp. 230-237.)

In subsequent cases, the *Turpin* decision has been strictly interpreted as defining the elements necessary to maintain a preconception negligence case. For instance, the Court of Appeal in *Foy v. Greenblott* (1983) 141 Cal.App.3d 1 [190 Cal.Rptr. 84], relied upon *Turpin* in denying a minor plaintiff's claim for "wrongful life" where all elements of a negligence cause

of action were not satisfied. (*Id.*, at pp. 14-15.) In *Foy*, plaintiff's mother, an incompetent person, became pregnant while detained in a mental health care facility and gave birth to the minor plaintiff, a normal healthy boy. Both filed lawsuits on the basis of negligent failure to supervise.

.In *Foy*, the trial court sustained demurrers without leave to amend as to all causes of action. The Court of Appeal reversed only as to the mother's cause of action. Consistent with *Stills*, in which the court was unwilling to expand recognition of preconception torts where a critical element was lacking, the *Foy* court affirmed as to the child's cause of action, since he failed to allege any legally cognizable injury. (141 Cal.App.3d at pp. 14-15.) Moreover, inasmuch as precedent in California "wrongful life" cases recognized claims against health care providers for negligent preconception genetic counseling, the *Foy* court found they provided little guidance in determining the scope of the duty owed to minor plaintiff by defendant under the facts presented.

Just as the *Foy* court denied plaintiff's claim due to an absence of actual injury, the court in *Simmons* v. *West Covina Medical Clinic* (1989) 212 Cal.App.3d 696, 699 [260 Cal.Rptr. 772], refused to permit plaintiff's "wrongful life" case to proceed in the absence of proximate cause. *Simmons* involved a claim by a mother and her son for "wrongful birth" and "wrongful life" resulting from the son's affliction with Down's Syndrome. The complaint alleged that defendants negligently failed to provide Mrs. Simmons with appropriate genetic testing, thus denying her the opportunity to discover the genetic defect in her unborn child and to terminate the pregnancy. The appellate court affirmed the granting of defendant's motion for summary judgment on the issue of proximate cause, since the genetic test provided only a 20 percent probability of detecting the risk of Down's Syndrome, as distinguished from the "reasonable degree of medical certainty" established in *Curlender*. (*Ibid.*)

The *Simmons* court recited the commonly accepted elements of a negligence action (including duty and its violation), pointing out that *the sole element in dispute was that of proximate cause*. (212 Cal.App.3d at p. 702.) So stating, it refused to "expand the circle of liability by abandoning established tort law principles of causation where there is only a mere possibility of detecting the genetic defect." (*Id.*, at p. 706.) The court held: "Under the facts of this case, we decline to establish a more lenient standard of causation. To do so would be contrary to sound logic, legal precedent, and public policy. . . . [¶] . . . We do not wish to intrude upon the Legislature's task of weighing such matters of public policy, and leave to it the function of deciding whether to provide a remedy for those genetically defective children and their parents who are unable to prove to a reasonable medical

certainty that medical negligence deprived the mother of the chance to terminate her pregnancy." (*Id.*, at pp. 705-706.)

Both *Simmons* and *Foy* make clear that a claim for preconception negligence will fail, unless it satisfies all elements of an ordinary negligence cause of action. A similar result was reached in *Munro* v. *Regents of University of California* (1989) 215 Cal.App.3d 977 [263 Cal.Rptr. 878], where this court held a doctor did not owe a legal duty to recommend Tay Sachs testing when no risk was indicated, and thereupon dismissed plaintiff's claim for preconception negligence. Plaintiffs, a married couple and their son (born with Tay Sachs disease), sued defendant for medical malpractice and infliction of emotional distress as a result of defendant's failure to recommend the genetic testing. In its decision, this court affirmed the trial court's entry of summary judgment in favor of defendant on various medical grounds, including the fact that neither of the Munro's had indicated they were of Jewish heritage and, therefore, appeared to pose no foreseeable risk. (*Id.*, at p. 989.)

In each of the above cases, the prevailing principle is clear. A special relationship between physician and patient may, in certain circumstances where the conduct is directly related to the resulting pregnancy and birth, give rise to a duty to the subsequently conceived child. Unlike in the present case, the defendants held liable in those cases were health care providers who were retained to provide genetic counseling to the respective parents. Understandably, their negligence in performing that function led the courts to recognize a duty owed to the foreseeably impaired children. Those defendants were specifically consulted for conception and pregnancy related purposes, and the parents relied on the doctors' advice in deciding *whether* to conceive a child or to terminate a pregnancy.

Whereas in California medical malpractice is a tort which arises out of the special physician/patient relationship (see, *Harding* v. *Liberty Hospital Corp.* (1918) 177 Cal. 520, 522-524 [171 P. 98]), no such relationship exists between motorists. ■ The physician/patient relationship generally, though not necessarily, arises out of an express contract which gives rise to a "definite" legal duty sounding in tort. (*Ibid.*) By this contract, the doctor impliedly warrants competency by undertaking to act as the physician, and render medical care and advice. Where that advice and care is directly related to the delivery of a healthy child, that child is tantamount to a foreseeable third party beneficiary of that contract to whom the courts have found that a duty of care is owed.

Arguably, it would ignore the realities of modern obstetrical practice to deny an infant, as the intended "beneficiary" of that contractual relationship,

independent protection against that same incompetent medical advice. Generally speaking, a woman who wishes to conceive and keep her child engages a physician to advise and guide her through pregnancy and, so far as humanly possible, to ensure the birth of a healthy infant. The latter consideration is uppermost in the minds of both a woman and her doctor. Thus, as the failure to properly diagnose, test, or disclose the alternatives and reasonably foreseeable risks and benefits of treatment will usually result in physical injury to the fetus alone, as opposed to the mother, it is reasonable that a cause of action belong to the infant, born alive. (See, e.g., *Hughson* v. *St. Francis Hosp. of Port Jervis* (1983) 92 A.D.2d 131 [459 N.Y.S.2d 814].)

■ On the other hand, there is no "special relationship" between motorists. The ordinary principles of negligence apply. Those principles cannot be validly extended to encompass a duty owed to a child conceived several years after her mother was involved in an automobile accident. If plaintiff has more children who sustain injuries as a result of plaintiff's alleged condition, shall defendant once again be hailed into court? The implications associated with finding a duty under the present facts are indeed staggering, and the trial court properly refused to find one.

California precedent absolutely requires a preliminary finding of duty in order for this case to proceed. "Duty" encompasses the question of whether a defendant is under any obligation to the plaintiff to avoid negligent conduct. Here, there was no relationship between this defendant and this plaintiff which gave rise to any legal obligation on defendant's part for the benefit of plaintiff. The trial court's dismissal of plaintiff's claim for want of a legal duty was proper. In examining precedents on this issue on a national level, we conclude that an initial finding of duty is likewise a requirement.

1. *Liability for preconception negligence in other jurisdictions appropriately hinges on the existence of duty.*

Plaintiff's statement that "no American court has any difficulty these days with finding a duty owed by the tortfeasor to the unborn child" does not bear close scrutiny. ■ In California alone, a tortfeasor owes no duty to an unborn child, unless that child is later born alive. (*Justus* v. *Atchison* (1977) 19 Cal.3d 564 [565 P.2d 122].) We are able to locate only six leading cases that have addressed the issue of whether a child can recover for injuries (other than birth) sustained as a result of alleged preconception negligence. We find no California courts that have ruled on the issue. Unlike the aforereferenced California cases wherein it was alleged that the negligence of the defendant medical care provider directly caused the *conception* and/or *birth* of the handicapped child, in the six cases from foreign jurisdictions, it

is alleged that the defendant's negligence actually caused the child's *handicap.*

One of the six decisions, *Renslow* v. *Mennonite Hospital* (1977) 67 Ill.2d 348 [367 N.E.2d 1250, 91 A.L.R.3d 291], was written by a sharply divided Illinois Supreme Court. The four-to-three decision found all three dissenting justices filing separate opinions. In *Jorgensen* v. *Meade Johnson Laboratories, Inc.* (10th Cir. 1973) 483 F.2d 237 and *Bergstreser* v. *Mitchell* (8th Cir. 1978) 577 F.2d 22, both courts speculated as to how the respective state courts might have decided the issue. Moreover, *Renslow* and *Bergstreser* courts were influenced by *Park* v. *Chessin* (1976) 88 Mis.2d 222 [387 N.Y.S.2d 204], a lower court decision subsequently *overruled* by the New York Court of Appeals in *Becker* v. *Schwartz* (1978) 46 N.Y.2d 401, 413 [413 N.Y.S.2d 895, 386 N.E.2d 807, 814]. (*Bergstreser* v. *Mitchell, supra,* 577 F.2d at p. 25; *Renslow* v. *Mennonite Hospital, supra,* 367 N.E.2d at p. 1256.) Plaintiff relies heavily on each of the above cases, but we have to question the factual and legal applicability of those decisions to the present case. Although contending that these cases are "major advances" and "mainstream," appellant cites no other preconception negligence case in which those decisions are followed.

*Jorgensen* v. *Meade Johnson Laboratories, Inc., supra,* 483 F.2d 237, was a product liability case in which the Court of Appeals, applying Oklahoma law, found the defendant pharmaceutical company could be held strictly liable for the retardation, deformities, and pain and suffering of plaintiff's mongoloid twin daughters. The infant plaintiffs alleged that their mother purchased and used defendant's birth control pills for several months. She became pregnant shortly after stopping their use and, subsequently, gave birth to the minor plaintiffs. Plaintiffs alleged that the birth control pills had altered the chromosomal structure of their mother's body and, as a consequence, the twins were born with severe deformities. The Tenth Circuit reversed the decision of the trial court and held that plaintiffs had stated a cause of action that could be maintained on a theory of strict liability in tort. (*Id.,* at p. 241.)

However, the *Jorgensen* decision must be limited in its application, as it dealt with preconception torts from a pure products liability standpoint.

Under a products liability theory, once a defect in manufacture or design is established, or where there has been a failure to give adequate notice of foreseeable potential hazards, liability of the manufacturer may be extended to the *entire* class of persons thereby affected. In *Jorgensen*, the defect in the product *was* the effect it could have on later conceived children; therefore, the injury to the fetus was foreseeable. Accordingly, the necessity of establishing manageable bounds for liability is conspicuously absent in the *Jorgensen* decision. Since *Jorgensen* was not concerned with the policy issues presented in the case at bar, any reliance thereon is misplaced.

While *Jorgensen* approached the issue of preconception tort liability from the standpoint of strict products liability, the Illinois Supreme Court in *Renslow* v. *Mennonite Hospital, supra,* 67 Ill.2d 348 [367 N.E.2d 1250], applied the tort elements of professional negligence to the preconception issue and found a duty owed to the minor plaintiff. In *Renslow,* the mother brought a medical malpractice action on behalf of her minor daughter. The complaint alleged that, on two occasions, defendant doctors had negligently transfused the mother's Rh negative blood with Rh positive blood. The mother's blood was sensitized by the negligent transfusion because of the incompatibility of the two blood types. Despite learning of the incompatibility, defendant doctors never advised the mother of the adverse reaction and associated risks. It was not until seven years later, during the course of a routine blood screening as part of her prenatal care, that the mother learned of her condition. Three months later minor plaintiff was born prematurely with severe and permanent neurological injury as a result of the damage defendant doctors caused to her mother's "hemolytic process," precisely the danger associated with such improper transfusion.

The sharply divided court, relying on *Jorgensen,* affirmed the ruling of the lower court, found that the child could maintain a cause of action against the defendant doctors. *The court observed that the plaintiff's right to maintain such a cause of action arose from the defendant's duty of due care which arose within the special relationship between doctor and patient,* stating that, "[l]ogic and sound policy require finding a legal duty in this case." (367 N.E.2d at p. 1255.)

Reasoning that it was foreseeable to the defendants at the time of the negligent transfusion, that their conduct would harm a subsequently conceived child and that the woman who received the improper blood transfusions could one day become pregnant, the court concluded that to permit plaintiff to have a cause of action would not be an unreasonable extension of the duty concept. (367 N.E.2d at p. 1253.) In reaching its conclusion, the Illinois Supreme Court observed that the basic understanding of Rh negative and Rh positive effects upon hemolytic disease of the newborn had been a

medical fact since the 1940's. (*Ibid.*) Thus, the court was able to easily conclude, based on the facts presented, that the harm caused plaintiff was "reasonably foreseeable" to the defendant doctor and hospital. (*Ibid.*)

We note that the majority's finding of a duty in *Renslow* was not unanimous. Three justices disagreed with the majority decision and wrote separate dissenting opinions. The most elaborate was that by Justice Ryan who focused on Dean Prosser's statement that " 'liability must stop somewhere short of the freakish and the fantastic.' " (367 N.E.2d at p. 1262.) It was Justice Ryan's position that the majority abandoned the concept of foreseeability and accepted the notion that where causation has been shown, all results are foreseeable. (*Ibid.*) Such a position, in Justice Ryan's stated belief, leads "unavoidably to liability stretching across generations." (*Id.*, at p. 1264.)

However, we find the persuasiveness of the *Renslow* decision to be diminished for another reason. Although the concurring opinion pointed out that "prenatal injury cases do not involve wrongs done prior to conception" (367 N.E.2d at p. 1257), the majority ignored that distinction and relied upon such precedents in reaching its conclusion.

We question the soundness of relying on such precedents. American jurisdictions uniformly recognize that a cause of action will lie in favor of a child for injuries due to prenatal torts since, *at the time* of the negligent conduct, there are two identifiable beings within the zone of danger, each of whom is owed a duty of due care and each of whom can be directly injured. (See, e.g., Civ. Code, § 29;[5] *Woods* v. *Lancet* (1951) 303 N.Y. 349 [102 N.E.2d 691, 27 A.L.R.2d 1250].) In fact, a child, if born alive, is now permitted *in every jurisdiction* that we are aware to maintain an action for injuries resulting from *prenatal* tortious conduct. (Prosser & Keeton, The Law of Torts, *supra*, § 55, p. 368.) Only a very small number of courts have permitted recovery for injuries sustained as a result of *preconception* conduct.

The persuasiveness of the *Renslow* decision is further diminished in our view since the *Renslow* court relied on the special term holding in *Park*, which was expressly overruled in *Becker*.

Almost one year after the *Renslow* decision, the federal Court of Appeals interpreted Missouri law in *Bergstreser* v. *Mitchell*, *supra*, 577 F.2d 22, and found that an action could be maintained by an infant for a preconception

---

[5]Civil Code section 29 reads as follows: "A child conceived, but not yet born, is to be deemed an existing person, so far as may be necessary for its interests in the event of its subsequent birth; . . ."

tort. The court relied on *Jorgensen* and *Renslow* to resolve the preconception issue, which was one of first impression in Missouri.

In *Bergstreser*, plaintiff's mother brought an action on her child's behalf against two physicians and a hospital for medical malpractice. The complaint alleged that several years prior to plaintiff's birth, the defendant physicians performed a Caesarean section on plaintiff's mother. During her pregnancy with plaintiff, the mother suffered an occult rupture of her uterus, allegedly resulting from the defendants' negligent performance of the earlier Caesarean section. The rupture necessitated an emergency Caesarean section in order to prematurely deliver the plaintiff, who was born with resulting brain damage.

Absent any Missouri law on the question of whether *preconception* negligence was actionable, the court looked to Missouri law on *prenatal* negligence for guidance in determining whether the child had stated a cause of action. (577 F.2d at p. 25.) The *Bergstreser* court noted that Missouri case law recognized that an infant who was born alive had a right of action for *prenatal* personal injuries. (*Ibid.*) After considering prenatal negligence case law the Eighth Circuit made a quantum leap in logic by holding that Missouri courts, therefore, would also permit an infant, born alive, to bring an action for injuries arising out of *preconception* negligent conduct.[6] (*Id.*, at p. 26.)

Thus, as in *Renslow*, this decision was questionably based upon precedent in prenatal negligence cases, which appears to us to be inapposite. The *Bergstreser* decision does address the distinction between prenatal and preconception torts and the attendant complications with the latter pertaining to difficulty in proof, the consequences of extending liability, and policy considerations in expanding the element of duty, etc. Moreover, according to the decision, "being born alive" is the only criterion for the successful assertion of a preconception tort and the damages resulting therefrom. In fact, the words duty, breach, causation, and foreseeability are not mentioned in the decision. For these reasons, we find *Bergstreser* to be lacking as persuasive authority in preconception tort cases.

Plaintiff contends that the California Supreme Court in *Turpin v. Sortini, supra,* 31 Cal.3d 220, relied on the decisions of *Renslow* and *Bergstreser* in reaching its conclusion that the plaintiff could maintain an action for "wrongful life." The plaintiff is incorrect. Rather, these cases are cited in the

---

[6]We question the integrity of the logic. Aside from clear differences in duty and foreseeability analysis, the Eighth Circuit's reasoning would lead to the conclusion that all states would allow preconception negligence actions since all states allow actions for prenatal negligence. We find the opposite to be true.

*Turpin* decision in connection with the issues of legally cognizable injuries as rationally ascertainable damages, not the liability aspect of plaintiff's claim. The Supreme Court's tangential reference to these cases is not even found until after it has noted that duty, breach, and proximate cause were undisputed. The *Turpin* court stated, immediately preceding its reference to *Renslow* and *Bergstreser*: "defendants do not contend that they owed no duty of care either to James and Donna or to Joy. [Citation.] Nor do defendants assert that the complaint fails to allege adequately either a breach of their duty of care or that Joy's birth was a proximate result of the breach." (*Id.,* at p. 230.)

The next major preconception tort case was decided by the New York Court of Appeals in *Albala* v. *City of New York, supra,* 54 N.Y.2d 269 [429 N.E.2d 786]. *Albala* involved a claim by a minor for injuries allegedly resulting from medical malpractice committed against his mother prior to his conception. Plaintiff's complaint alleged the defendant doctor negligently performed an abortion on plaintiff's mother in 1971, during the course of which her uterus was perforated. Plaintiff's mother instituted a lawsuit against the doctor and received a $175,000 settlement in June of 1979. Minor plaintiff was conceived in September of 1975, while his mother's case was still pending. Plaintiff was born on June 3, 1976, with brain damage alleged to have been due to the malpractice which occurred four years earlier.

In *Albala,* the court faced a situation where the defendant's alleged negligence made the difference between life in an impaired state and life in an unimpaired state. The court was mindful of plaintiff's assertion that it was foreseeable to the defendant physician that plaintiff's mother would again conceive and that the health of the children born thereafter could be adversely affected by damage to her uterus. With that in mind, admitting the emotional difficulty of the conclusion which it reached, the court nonetheless stated: "We disagree, however, that this foreseeability alone established a duty to plaintiff on the part of defendants. We determined long ago in a case involving policy issues as sensitive as the ones at bar that foreseeability alone is not the hallmark of legal duty for if foreseeability were the sole test we could not logically confine the extension of liability. [Citations.] [¶] *Thus, were we to establish liability in this case, could we logically preclude liability in a case where a negligent motorist collides with another vehicle containing a female passenger who sustains a punctured uterus as a result of the accident and subsequently gives birth to a deformed child?* Unlimited hypotheses accompanied by staggering implications are manifest." (Italics added.) (429 N.E.2d at p. 788.)

The above demonstrates the *Albala* court, therefore, was concerned about the same unwarranted extension of duty that formed the basis of the trial

court's decision here. In relying upon *Howard* v. *Lecher* (1977) 42 N.Y.2d 109 [397 N.Y.S.2d 363, 366 N.E.2d 64, 69], the court recognized: "[W]hen faced with a novel cause of action sentiment should be put aside and the law must establish the rules ascribing liability in a manner which avoids the drawing of artificial and arbitrary boundaries." (*Id.*, at p. 788.) The court stated that: "While the temptation is always great to provide a form of relief to one who has suffered, it is well established that the law cannot provide a remedy for every injury incurred." (429 N.E.2d at p. 789.)

As the court explained in further support of the previous grant of defendant's motion for summary judgment: "In defining the common law, it is this court's duty to consider the consequences of recognizing a novel cause of action and to strike the delicate balance between the competing policy considerations which arise whenever tort liability is sought to be extended beyond traditional bounds." (429 N.E.2d at p. 789.)

In reaching its decision, the *Albala* court considered, and dismissed as unpersuasive and flawed, the cases of *Renslow, Bergstreser* and *Jorgensen.* It viewed with apprehension cases "which would honor claims assuming the breach of an identifiable duty for less than a perfect birth . . ." (429 N.E.2d at p. 788.) The *Albala* court, noted plaintiff's injuries were both foreseeable and causally related and had resulted in ascertainable damages. Nonetheless plaintiff's claims were denied as a matter of policy *due to the absence of any duty.*

Plaintiff's statements that "the Court of Appeals of Michigan has taken account of *Albala* and expressly rejected its primary reasoning" is miscast. In actuality, in *Monusko* v. *Postle* (1989) 175 Mich.App. 269 [437 N.W.2d 367], the Michigan court made a rational distinction between the facts before it and those in *Albala.* Specifically, in *Monusko,* plaintiffs alleged that the failure of defendants to test Mrs. Monusko for her rubella status and to immunize her against rubella prior to conception resulted in the minor's injuries. The court stated that "[t]he tests and immunization, . . . are designed specifically to alleviate the sort of injuries we have in this case." (437 N.W.2d at p. 369.) In so doing, it recognized the "direct connection" between the negligent *prenatal* care and resultant injury to the child, giving rise to a legal duty.

Unlike in *Albala,* Mrs. Monusko indicated to her doctor that she wished to have a child. The *Monusko* court concluded that the negligent conduct of the doctors constituted failure to render appropriate prenatal care in light of the standard of the American College of Obstetrics and Gynecology, which recommends that a rubella test be given to pregnant women if their status is unknown. (437 N.W.2d at p. 369.) As the wrongful conduct occurred while

the defendant doctors were treating the mother specifically in preparation for conception and undertaking to render prenatal care, that conduct resulted in a duty owed to the subsequently conceived fetus. (*Id.*, at p. 370.)

Significantly, the dissent in *Monusko*, written by Presiding Judge MacKenzie, criticized the majority's opinion as containing flawed reasoning. Judge MacKenzie stated that the majority appeared to maintain that: "the child's conception was foreseeable and that this foreseeability gives rise to defendants' duty to the child." (437 N.W.2d at p. 371.) He further noted, "[u]nder the majority's logic, all persons would be deemed to foresee, and thus owe a duty to the future children of all other persons." (*Ibid.*) His illustrative hypothetical is especially interesting given the facts alleged by Ms. Hegyes in this case: "[S]uppose that a thirteen-year-old girl is struck while crossing a street by a negligently driven automobile, sustaining fractures to her pelvis. At age thirty-three, she gives birth to an infant who sustains prenatal injuries from a malformation in the mother's pelvis caused by improper healing of the fractures. Under the majority's holding, it would be possible for the injured infant to maintain an action against the person who drove the automobile twenty years earlier." (*Ibid.*)

Judge MacKenzie realized that the implications of such a result are staggering and certainly not consistent with a sound interpretation of the requirements for successfully maintaining a negligence cause of action.

In New York, *Albala*'s "policy" decision denying a minor's cause of action for a preconception tort based on negligence and medical malpractice was expressly upheld and affirmed in *Catherwood* v. *American Sterilizer Co.*, *supra*, 498 N.Y.S.2d 703. *Catherwood* was an action arising out of chromosomal damage allegedly attributable to the mother's exposure to ethylene oxide prior to the child's conception. Citing *Albala*, the Appellate Division of the New York Supreme Court granted defendant's motion to dismiss plaintiff's claims for negligence, strict liability, breach of warranty, and fraud. (*Id.*, at pp. 705-706.) In so doing the court closed the litigation doors to plaintiffs claiming injuries due to preconception acts, unless a duty to the unconceived is found, stating: "In order to allow a cause of action for pre-conception tort there requires the finding of a duty to the unconceived. Such a duty can only be couched in terms of a duty to protect the potentiality of life. [Citation.] New York has not recognized any such duty." (*Id.* at p. 706.)

Although the *Catherwood* facts did not establish a duty owed to the subsequently conceived child, the Appellate Division of the New York Supreme Court was presented with sufficient facts to support the finding of a legal duty in *Enright by Enright* v. *Eli Lilly & Co.* (1990) 155 A.D.2d 64 [553 N.Y.S.2d 494]. In *Enright*, a child born with birth defects and her

parents brought an action to recover damages from manufacturers of diethyl-stilbestrol (DES). Based upon an express state policy and legislative enactments favoring a remedy for DES-caused injuries, the court held that plaintiff had a cause of action for strict products liability for injuries caused by her mother's exposure to DES prior to plaintiff's conception. (553 N.Y.S.2d at p. 497.) The court recognized this cause of action as "separate and distinct from liability based upon negligence," which was not permitted pursuant to *Albala. (Ibid.)* Furthermore, stating that "[t]he distinguishing factor is DES," the court differentiated its case from the facts in the *Catherwood* decision. *(Id.,* at p. 496.)

Thus, unwilling to recognize an absolute and automatic duty to children injured as a result of preconception conduct, the New York courts have rationally limited liability for preconception conduct to those instances wherein a duty to the injured child can be found. To date, such a duty has only been found in DES-related situations, based on specifically crafted express state policy.

Perhaps most indicative of what courts will do when faced with facts like those presented here, is the decision of the Supreme Court of Georgia in *McAuley* v. *Wills, supra,* 251 Ga. 3 [303 S.E.2d 258]. *McAuley* involved a complaint for wrongful death of a child who was conceived subsequent to his mother's paralysis in an automobile accident. It was alleged that the child died the day after birth from cardiac arrest caused by the infant's inability, due to the mother's paraplegia, "to pass through the fetal course in an uneventful manner." (303 S.E.2d at p. 258.) The infant's mother sued the allegedly negligent driver, alleging the child's death was directly and proximately caused by the negligence of that driver in causing the car crash.

The court recognized that, at least in some situations, a person should be under a duty of care toward an unconceived child. (303 S.E.2d at p. 260.) However, the court *did not* find a duty to the minor plaintiff under the facts presented. It stated: "[W]e do hold that the negligence of the defendant Wills and the injuries resulting in the death of McAuley's child are too remote for the law to sanction a recovery against Wills for the child's death. Our holding in this regard is based on one of two assumptions. First, assuming that the car crash in 1979 left Mrs. McAuley wholly unable to give birth to a child, this would be an element of damages recoverable by her in the personal-injury action on her own behalf which is currently being litigated. Second, assuming that the car crash did not leave Mrs. McAuley wholly unable to give birth to a child, then the delivery of the child in a manner incompatible with the mother's paraplegia constituted an intervening act not reasonably foreseeable at the time of the car crash." *(Id.,* at p. 260.)

Thus, the court affirmed the trial court's granting of the defendant's motion to dismiss on the ground that the complaint failed to state a claim on which relief could be granted in that defendant driver could not be said to have owed a legal "duty to protect the plaintiff from the injury which in fact occurred." (303 S.E.2d at p. 261.)

 The present case is analogous to that before the *McAuley* court. If O'Hare's doctor did not recognize and advise her of the danger of having a child, then either there was an intervening act of malpractice *or* the harm was unforeseeable to that doctor and, obviously, therefore, to the defendant motorist. On the other hand, if the doctor did warn O'Hare of the risks associated with becoming pregnant, and O'Hare nonetheless decided to proceed with pregnancy, her voluntary and knowing act was an intervening intentional act, breaking the chain of causation.

Given that these are the only two pleading options available to the plaintiff and neither scenario gives rise to a finding of duty, the trial court correctly found that granting leave to amend would be futile.[7] The trial court's finding is entirely consistent with the *McAuley* decision, as well as the other out-of-state cases limiting liability for preconception negligence to instances where a duty to the minor plaintiff is found. Where no such duty exists, no negligence action, regardless of the type of claim asserted, can survive the challenge of a demurrer.

### 2. *No legal duty is owed to "persons" outside of the protected class.*

In addition to the above noted absence of judicial endorsement for the relief sought, no statute or public policy argument supports classifying plaintiff as a person to whom a legal duty was owed at the time of the car accident. There is no legitimate state interest in finding plaintiff's interests protected under the present facts. On the other hand, statutes do exist wherein the Legislature has acknowledged the state's interest in providing proper and adequate prenatal medical care and genetic counseling for the direct benefit of subsequently conceived children. Congruous with judicial resolve, violations of those statutes clearly give rise to a legal duty of care to the handicapped child born as a result of the health care provider's negligence.

By way of example, Health and Safety Code section 289 emphasized the compelling state interest with respect to comprehensive prenatal services as follows: "The Legislature finds and declares that prenatal care, delivery

---

[7]Plaintiff has done nothing to suggest that there are additional facts with which her pleading could be supplemented.

service, postpartum care and neonatal and infant care are essential services necessary to assure maternal and *infant health.*" (Italics added.) (See also, Historical Note, 74A West's Ann. Welf. & Inst. Code (1991 ed.) § 14134.5, pp. 333-334.)

Furthermore, the Legislature has enacted specific statutes concerning the need for proper and effective genetic testing. In Health and Safety Code section 150 et seq., known as the Hereditary Disorders Act, the Legislature expressly found that: "(a) Each person in the State of California is entitled to health care commensurate with his or her health care needs, and to protection from inadequate health services not in the person's best interests." (Health & Saf. Code, § 150.) It further declared that: "(b) Hereditary disorders . . . are often costly, tragic, and sometimes deadly burdens to the health and well-being of the citizens of this state. [¶] (c) Detection through screening of hereditary disorders can lead to the alleviation of the disability of some hereditary disorders . . . ." (*Ibid.*)

In Health and Safety Code section 300 et seq., regarding maternal and child health, it is noted: "[§ 309. Genetic Testing] [¶] (a) It is the policy of the State of California to make every effort to detect, as early as possible, phenylketonuria and other preventable heritable or congenital disorders leading to mental retardation or physical defects. . . ."

The above provisions evidence the state's interest in protecting children conceived or born in the state of California from injuries resulting from prenatal or preconception medical negligence. Thus, a duty is easily recognized where, as in the cases described earlier, the parents consulted the physician for the express purpose of determining whether to conceive a child or to terminate an existing pregnancy, and the doctors' negligence in rendering that advice resulted in the birth of a handicapped child.

There is no similar statute or provision protecting a fetus from alleged preconception negligence in operating a vehicle. Therefore, in addition to there being no judicial support for finding a duty in this case, there is also no statutory basis for classifying plaintiff's interests as protectable.

By example, Vehicle Code section 17150 provides that an owner is responsible for the negligent operation of his or her vehicle that causes injury or death to a person or property. It states: "Every owner of a motor vehicle is liable and responsible for death or injury to person or property resulting from a negligent or wrongful act or omission in the operation of the motor vehicle, in the business of the owner or otherwise, by any person using or operating the same with the permission, express or implied, of the owner."

Civil Code section 29 provides that a child is *not* a "person" entitled to recover for injuries *until it is conceived.* That section provides as follows: "*A child conceived, but not yet born, is to be deemed an existing person,* so far as may be necessary for its interests in the event of its subsequent birth; . . ." (Italics added.)

Here, plaintiff does not qualify as a "person" whose interests are protected by the Vehicle Code. Had her mother been pregnant at the time of the car accident, and had plaintiff been directly injured and subsequently born alive, the result would be different pursuant to the above statutes.

Despite plaintiff's contentions, the law does not countenance recovery for all injuries caused by allegedly negligent conduct. The Supreme Court, in *Justus* v. *Atchison, supra,* 19 Cal.3d 564, denied the parents' claim for wrongful death due to the fact that their child was not in the class of persons sought to be protected by the wrongful death statute (Code Civ. Proc., § 377). (19 Cal.3d at p. 567.) In *Justus,* the court held that a cause of action for wrongful death cannot be pleaded by the parents of an infant decedent, unless the infant was born alive. (*Id.* at pp. 577-580.) In denying wrongful death recovery for stillborn infants, the court has determined that such an infant is not a "person" or "child" to whom a duty of care flows for purposes of the wrongful death statute. (*Ibid.*) Although denying the *Justus*' claim on different grounds than those applicable here, the result is the same. On occasion, the law cannot provide a remedy. The courts must draw requisite boundaries.

Here, the trial court's opinion considered pertinent judicial and statutory authority and found that neither supported a finding of legal duty and under the facts presented, found no duty as a matter of "policy." We find no error in the court's reasoning.

3. *No legal duty is violated where the plaintiff's injury is not reasonably foreseeable.*

While the question of whether one owes a duty to another must be decided on a case by case basis, every case is governed by the rule of general application that persons are required to use ordinary care for the protection of those to whom harm can be reasonably foreseen. (*Rowland* v. *Christian* (1968) 69 Cal.2d 108, 112 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496].) This rule not only establishes, but limits, the principle of negligence liability. The court's task in determining duty is to evaluate "whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced" such that liability may appropriately be

imposed upon the negligent party. (*Ballard* v. *Uribe, supra*, 41 Cal.3d 564, 573, fn. 6.)

■ Applying that standard to the aforementioned "special relationship" cases where a duty was found to exist, the birth of a handicapped child was arguably a "likely result" of the defendant's professionally negligent conduct. In this case, however, that standard leads to a different result. Defendant's conduct was not "likely to result" in plaintiff's conception or birth, let alone her alleged injuries nearly three years after the car accident. Unlike a medical professional's conduct which is directly and intentionally related to whether a child is conceived or born, such conception or birth is not a reasonably foreseeable result of the operation of a car.

This doctrine was fully expounded in the landmark case of *Palsgraf* v. *Long Island R. Co.* (1928) 248 N.Y. 339 [162 N.E. 99, 59 A.L.R. 1253]. In *Palsgraf*, a man carrying a package of fireworks attempted to board a moving train, assisted by defendant's employee. The package was dislodged, fell, and exploded, causing a platform to fall down and strike plaintiff, who was standing several feet away. The court found that negligence in the abstract is not a tort and that there *must* be a violation of a duty toward the *plaintiff*, who cannot recover merely for negligence towards someone else. (162 N.E. at p. 101.) Therefore, Helen Palsgraf, as the unforeseeable plaintiff, could not recover from defendant for its employee's negligence.

In narrowing the area of actionable causation, Chief Justice Cardozo drew the line at foreseeability. Negligence must be a matter of some relation between the parties, some duty, which could be founded only on the foreseeability of some harm to the plaintiff in fact injured. " 'Proof of negligence in the air, so to speak, will not do.' " (162 N.E. at p. 99.)

■ Thus, the important practical effect of the *Palsgraf* rule is that liability for unforeseeable consequences is avoided by limiting the scope of *duty*, rather than by application of rules of proximate causation. In fact, the *Palsgraf* court specifically stated that the question of proximate cause is not involved where there is no negligence as to the particular plaintiff. Hence, the admonition of writers to " 'look for the duty before you talk causation,' " because " 'there is no duty to an unforeseeable plaintiff.' " (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 733, pp. 61-62; see also *Mosley* v. *Arden Farms Co.* (1945) 26 Cal.2d 213, 220 [157 P.2d 372, 158 A.L.R. 872] (conc. opn.); Rest.2d Torts, § 281, com. c.)

Thus, in determining to whom a legal duty is owed, foreseeability is the prime element by which courts are guided. However, the existence of a legal duty is not to be bottomed on the factor of foreseeability alone. The Supreme

Court in *Rowland* v. *Christian, supra,* 69 Cal.2d 108, 113, advanced the following considerations in evaluating whether a duty of care was owed: "[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved."

 The Supreme Court, however, to ensure recognition that the law does not champion legal redress for *all* foreseeable harm, stated in *Dillon* v. *Legg* (1968) 68 Cal.2d 728, 739 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316]: "In order to limit the otherwise potentially infinite liability which would follow every negligent act, the law of torts holds defendant amenable only for injuries to others which to defendant *at the time were reasonably foreseeable.*" (Italics added.)

The court in *Dillon* sought to confine the potential reach of foreseeability by limiting it to "those risks or hazards whose likelihood made the conduct unreasonably dangerous" and, then, by evaluating the nature of the injury and its causal relation to the conduct which caused it. (68 Cal.2d at p. 739.)

*Dillon* was followed by *Rodriquez* v. *Bethlehem Steel Corp.* (1974) 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669], wherein the court stated: " 'Whether a risk is sufficiently foreseeable to give rise to a duty of care depends on the circumstances of each case, including the relationship of the parties and the nature of the threatened injury.' " (*Id.,* at p. 399.)

Soon thereafter, in *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441 [138 Cal.Rptr. 302, 563 P.2d 858] and *Baxter* v. *Superior Court* (1977) 19 Cal.3d 461 [138 Cal.Rptr. 315, 563 P.2d 871], the court decided the social burden of expanding liability to encompass a novel cause of action for loss of parent-child consortium was unwarranted. It adopted the rationale of cases which forthrightly acknowledged that *Dillon*'s limitations on duty are formed by more than lack of foreseeability. As the Supreme Court said in *Borer:* " 'Nevertheless our decision must take into account considerations in addition to logical symmetry and sympathetic appeal. . . . [N]ot every loss can be made compensable in money damages, and legal causation must terminate somewhere. In delineating the extent of a tortfeasor's responsibility for damages under the general rule of tort liability (Civ. Code, § 1714), the courts must locate the line between liability and nonliability at some point, a decision which is essentially political.' " (*Borer* v. *American Airlines, Inc., supra,* 19 Cal.3d at pp. 446-447.)

■ Thus, despite the broad maxim that for every wrong there is a remedy, the courts and Legislature of this state have decided that *not* all injuries are compensable at law. (*Justus* v. *Atchison, supra,* 19 Cal.3d 564 [death of stillborn is not actionable under wrongful death statute]; Civ. Code, § 29 [child may not sue his or her parents for "wrongful life"].) Plaintiff's alleged injuries must necessarily fall within that category. ■ A motorist cannot reasonably foresee that his or her negligent conduct might injure a child subsequently conceived by a woman several years after a car accident.

Even accepting, arguendo, that it is foreseeable that a woman of child bearing years may some day have a child, there are areas of foreseeable harm where legal obligation still does not arise. ■ It must be admitted that there existed the bare *possibility* that the injury complained of in this case could result from the acts of defendant. However, the creation of a legal duty requires more than a mere possibility of occurrence since, through hindsight, everything is foreseeable.

Judicial discretion is an integral part of the duty concept in evaluating foreseeability of harm. That sentiment is best evidenced by the following comment by Dean Prosser: "In the end the court will decide whether there is a duty on the basis of the mores of the community, 'always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.'" (Prosser, *Palsgraf Revisited* (1953) 52 Mich.L.Rev 1, 15.)

Thus, the concept of legal duty necessarily includes and expresses considerations of social policy. The trial court's determination with respect to those considerations have merit and rationality, and we so find.

C. *Plaintiff's reliance upon "causation" as the lynchpin of her cause of action is not only legally incorrect, but improperly raises an issue for the first time on appeal.*

■ Plaintiff concedes that the trial court ruled on the demurrer "in terms of the existence or non-existence of a duty owed to this plaintiff by the tortfeasor." Plaintiff also correctly contends that the trial court "did not address in its ruling the sufficiency of the pleading as it alleged cause and proximate cause." Causation, however, was never raised or argued and, therefore, was never resolved by the court below. ■ Inasmuch as the issues on appeal are determined by the lower court's ruling, contentions not presented to the trial court may not be raised for the first time on appeal. (*Irwin* v. *Pacific Southwest Airlines* (1982) 133 Cal.App.3d 709, 717 [184

Cal.Rptr. 228].) Hence, the issue of causation and the sufficiency of plaintiff's allegations in that regard are not properly before this court.

■ Nevertheless, the tort rationale for imposing liability on a defendant for preconception negligence is grounded on duty, and not just causation analysis. While causation is an indispensable element of negligence liability, it is neither the only element, nor a substitute for "duty." Even if a defendant has acted negligently, if he owes no duty to the plaintiff, he may not be held liable. (*In re Rexplore, Inc., Securities Litigation* (N.D.Cal. 1988) 685 F.Supp. 1132, 1148.)

Thus, while Civil Code section 1714 provides that a person may be liable for injuries caused by his failure to exercise ordinary care under the circumstances, the law requires more than a mere failure to exercise care and resulting injury. There must be a legal duty owed to the person injured. It is the breach of that duty that must be the proximate cause of the resulting injury. The determination that a duty of care exists is an essential prerequisite to liability founded on negligence. (*Hooks* v. *Southern Cal. Permanente Medical Group* (1980) 107 Cal.App.3d 435, 443 [165 Cal.Rptr. 741].) In fact, since it is the breach of that duty which must be the causal factor in the injury alleged, duty must be found before causation or injury can even be considered.

Distilled to its essential ingredient, we discern that plaintiff's position is that actual causation substitutes for duty, and the existence of damage obviates the necessity of a finding that that duty was violated. In other words, causation and damage would become the sole elements of a cause of action for negligence, jettisoning the traditionally included elements of duty and violation of duty.

This court need look no further than plaintiff's own brief to find authority against evaluating preconception negligence claims on the basis of causation. In *Renslow* v. *Mennonite Hospital, supra*, 62 Ill.2d 348 [367 N.E.2d 1250], the preconception negligence case cited most emphatically by plaintiff, the court *refused* to focus on the aspect of causation in rendering its opinion. Indeed, the court discounted the value of causation analysis in determining whether a child who sustains injury as a result of preconception conduct should be afforded a cause of action. The court instructed: "It has been aptly observed, however, that '[c]ausation cannot be the answer; in a very real sense the consequences of an act go forward to eternity, and back to the beginning of the world. Any attempt to impose responsibility on such a basis would result in infinite liability for all wrongful acts, which would "set society on edge and fill the courts with endless litigation." ' [Citation.] Thus, policy lines, to some extent arbitrary, must be drawn to narrow an area

of actionable causation. We see no inherent advantage to discarding the policy lines, defined traditionally as 'duty,' in favor of new policy lines which would be necessary to circumscribe actionable causation. [¶] *We reaffirm the utility of the concept of duty as a means by which to direct and control the course of the common law.*" (Italics added.) (367 N.E.2d at p. 1254.)

The *Renslow* court correctly resolved that causation alone does not impute liability in a negligence context absent a preliminary finding of duty and reasonable foreseeability. California courts agree that in order to establish liabilities, there must be more than a mere failure to exercise care for a resulting injury. (*Katona* v. *County of Los Angeles* (1985) 172 Cal.App.3d 53, 59 [218 Cal.Rptr. 19].) There must be a legal duty owed to the person injured to exercise care under the circumstances, and a breach of that duty must be the proximate cause of the resulting injury. (*Ibid.*) The determination that a duty exists is therefore an essential precondition to liability founded on negligence.

We refuse to be persuaded by appellant's notion that causation and injury are the sole determinants of liability. The fundamental expression of the need in the law of negligence for a concept of duty and foreseeability was provided over 60 years ago in *Palsgraf* v. *Long Island R. Co.*, *supra*, 248 N.Y. 339 [162 N.E. 99], and has withstood the test of time. Plaintiff's theory of "no fault" liability is without merit or support.

V.

DISPOSITION

The judgment is affirmed. Costs of appeal are awarded to respondents.

Lillie, P. J., concurred.

**JOHNSON, J.**—I respectfully dissent.

Contrary to the majority I conclude the California Supreme Court already resolved the sole issue involved in this case almost 10 years ago. In *Turpin* v *Sortini* (1982) 31 Cal.3d 220 [182 Cal.Rptr. 337, 643 P.2d 954] our high court established the general rule that tortfeasors in general, including negligent automobile operators, owe a duty to postconceived children for damages these infants later sustain as a result of injuries the tortfeasor inflicted on their mothers. Furthermore, assuming it were an issue of first impression, I conclude the existence of this duty is supported by fundamental principles governing tort law in California. Accordingly, I would reverse the demurrer in this case.

## I. *The California Supreme Court Already Has Extended the Duty of Care to Children Conceived After the Tortious Act Is Committed Against Their Mothers*

Although the court below treated this as a case of first impression in California, the central legal question—whether a tortfeasor can be held liable for injuries experienced by a child conceived after the tortious act—most certainly is *not* an issue of first impression in this state. Indeed, the California Supreme Court has spoken directly on the point and allied our state with those jurisdictions allowing postconceived children a remedy against those who injure their mothers in such a way they emerge from the womb severely impaired or worse.

In the very same opinion where our high court decided a child could *not* recover *general* damages for her "wrongful birth," it also held:

"With respect to the issue of legally cognizable injury, . . . the difficult question here does not stem from the fact that defendants' allegedly negligent act and plaintiff's asserted injury occurred before plaintiff's birth. Although at one time the common law denied recovery for injuries inflicted before birth, California—in tune with other American jurisdictions—has long abandoned that arbitrary limitation. [Citations omitted.] Thus, if [the plaintiff infant's] deafness . . . resulted from *a tort committed upon her mother before conception* (see, e.g., *Renslow* v. *Mennonite Hospital* (1977) 67 Ill.2d 348 [367 N.E.2d 348, 91 A.L.R.3d 291]); *Bergstresser* v. *Mitchell* (8th Cir.1978) 577 F.2d 22; Annot. (1979) 91 A.L.R.3d 316), it is clear that *she would be entitled to recover against the negligent party.*" (*Turpin* v. *Sortini, supra*, 3 Cal.3d 220, 230-231, italics added.)

This statement of law is not dictum. Indeed it is "essential to the court's reasoning" and to the *result* in the *Turpin* opinion. For, if the court had ruled otherwise on this issue, that would have ended the matter. The infant plaintiff in that case indeed had been conceived after the defendant's negligent acts. Thus, if a child would not be entitled to recover against a negligent party for torts committed against her mother before conception, the *Turpin* plaintiff would have been out of court on that ground—and would have been out of court, *entirely*, not merely for purposes of general damages.

Having ruled as it did on the issue relevant in the instant case, the California Supreme Court had to reach a further question in *Turpin*. There the defendant's alleged negligence was a failure to warn the parents of a *hereditary* condition which meant their child, the plaintiff, if conceived was destined to be born deaf. Criticizing an appellate court opinion (*Curlender* v.

*Bio-Science Laboratories* (1980) 106 Cal.App.3d 811 [165 Cal.Rptr. 477]) which had upheld the child's right to general damages in such a case, the court highlighted the vital difference between *Turpin* and situations, like the instant case, where a tortfeasor—not genetics—has injured the mother.

"The basic fallacy of the *Curlender* analysis is that it ignores the essential nature of the defendants' alleged wrong and obscures a critical difference between wrongful life actions and the ordinary prenatal injury cases noted above. In an ordinary prenatal injury case, if the defendant had not been negligent, the child would have been born healthy; thus, as in a typical personal injury case [like the instant case], the defendant in such a case [like the instant case] has interfered with the child's basic right to be free from physical injury caused by the negligence of others. In this case, by contrast, the obvious tragic fact is that plaintiff never had a chance 'to be born as a whole, functional human being without total deafness'; if defendants had performed their jobs properly, she would not have been born with hearing intact, but—according to the complaint—would not have been born at all." (*Turpin* v. *Sortini, supra,* 31 Cal.3d at p. 231.)

Although respondents at times attempt to characterize the instant case as a "wrongful birth" case—and persuaded the trial court and the majority of this court to treat it as one—it is apparent from the *Turpin* analysis it clearly is not. But for defendants' negligence injuring plaintiff's mother, the Heyges' infant would have been "born as a whole, functional human being." Unlike *Turpin,* it is by no means true that if defendant had "performed [his driving] properly, she . . . would not have been born at all." Accepting the allegations of the complaint, she just would have been born healthy instead of terribly impaired. So we need not face any of the metaphysical paradoxes —is it better to live with a handicap than not to have lived at all—that trouble the courts in "wrongful life" cases. Nor need we bother with the damage calculation (and cancellation) problems—mitigating pain and suffering damages with the value of existence—which persuaded the Supreme Court to deny recovery of general damages in such cases.

In evaluating the precedential value of the quoted language in *Turpin,* it also is important to recall the ultimate result in that case. Having found a duty to postconceived children and a violation of that duty, but concluding it was unwilling and unable to award *general* damages, the Supreme Court nevertheless approved the awarding of *special* damages to postconceived children even in these "wrongful birth" cases. Consequently, the court's holding there is a duty to postconceived children was essential to the *result* in that case. Far from dictum, it is a full-fledged holding of this state's highest court and binding on lower courts.

As a second line of defense, respondents urge the duty to postconceived children is only owed by medical practitioners and products manufacturers and not by other tortfeasors. They construct this supposed limitation out of the happenstance that most of the handful of cases discussing this duty thus far have been medical malpractice and/or product liability cases. However, the rule announced in *Turpin* and the line of cases on which the California Supreme Court relied in *Turpin* is not in any way limited to the medical malpractice or drug manufacturer context.

In *Turpin* itself, as will be recalled, the California Supreme Court stated the rule in the most comprehensive terms, imposing liability for any "tort committed upon [an infant's] mother before conception." If the court meant to limit the duty to the kind of tortfeasor which happened to be involved in that case, it could have imposed liability for any "malpractice committed upon the mother before conception." But instead it used a general term in order to state a general principle. Thus, under *Turpin* the class of defendants who have a duty toward postconceived children includes all "tortfeasors"—not just medical malpractice tortfeasors, not just product liability tortfeasors, but tortfeasors in general.

The California Supreme Court in *Turpin* cited two out-of-state cases supporting the tortfeasor's duty to postconceived children. The first of these is *Renslow* v. *Mennonite Hospital, supra,* 67 Ill.2d 348 [367 N.E.2d 1250]. In that case doctors transfused Rh-positive blood into the veins of an Rh-negative girl when she was 13 years old. The girl grew up, married, and became pregnant. During the prenatal period her obstetrician discovered the improper transfusion eight years earlier had affected the mother's body chemistry in such a way as to cause damage to the fetus. As in the instant case, this necessitated a premature delivery and resulted in serious, permanent disabilities.

As the California Supreme Court did in *Turpin*, the Illinois Supreme Court expressed its holding in the broadest terms, not limited to medical malpractice situations, and supported the new rule with a rationale which applies with equal force to the instant case. "This court has long recognized that a duty may exist to one foreseeably harmed though he be unknown and remote in time and place [Citations omitted]. . . .The cases allowing relief to an infant for injuries incurred in its previable state make it clear that a defendant may be held liable to a person whose existence was not apparent at the time of his act. We therefore find it *illogical to bar relief for an act done prior to conception where the defendant would be liable for this same conduct had the child, unbeknownst to him, been conceived prior to his act.* We believe there is a right to be born free from prenatal injuries foreseeably caused by

a breach of duty to the child's mother." (*Renslow* v. *Mennonite Hospital, supra,* 367 N.E.2d 1250, 1254-1255, italics added.)

Rather than limit the duty to medical practitioners, the Illinois Supreme Court instead implied it was *excluding* certain limited categories of defendants from the duty—those whose nuclear or chemical accidents do genetic damage that passes down through the generations, thus creating "self-perpetuating" injuries afflicting "remote descendents." (367 N.E.2d at p. 1255.) Nowhere is it hinted the court intended to exclude a driver who harms a specific woman in such a way as to injure a specific child who is conceived after the negligent event.

Indeed the rationale used to justify extending recovery to these post-conceived children clearly applies to the offspring of women injured in automobile accidents. That express rationale was that postconceived children should be treated the same as already conceived fetuses whose existence was unknown to the tortfeasor. (367 N.E.2d at p. 1255, quoted above.) Respondents clearly would owe a duty to an unknown fetus who was injured in her mother's womb during this same automobile accident under California law (*Scott* v. *McPheeters* (1939) 33 Cal.App.2d 629 [92 P.2d 678]) as well as under Illinois law (*Amann* v. *Faidy* (1953) 415 Ill. 422 [114 N.E.2d 412] [pregnant mother injured in automobile accident gave birth to impaired infant who died shortly after birth and wrongful death action allowed]; *Rodriquez* v. *First Nat. Bank* (1953) 415 Ill. 496 [114 N.E.2d 721] [infant entitled to recover for personal injuries resulting from negligent acts committed on mother while plaintiff was fetus].) Consequently, applying the rationale of the *Renslow* opinion cited with approval by the California Supreme Court in *Turpin,* respondents owed a duty to the unknown postconceived infant in the instant case.

The other out-of-state case on which the California Supreme Court relied in announcing its rule in *Turpin* was *Bergstreser* v. *Mitchell* (8th Cir. 1978) 577 F.2d 22. This, too, was a case arising out of medical malpractice. Yet once again the holding the court announced and the rationale it used to justify that holding were much broader and would clearly support a duty of negligent car drivers toward the postconceived children of their female victims.

In *Bergstresser* the malpractice happened two years before the plaintiff's birth when the doctor damaged the mother's uterus in the course of a Caesarean delivery of an earlier child. As in the instant case, this eventually required the plaintiff to be delivered prematurely. During that delivery the infant suffered serious injuries including brain damage.

The Eighth Circuit was called upon to decide whether Missouri law would allow recovery for "injuries arising from allegedly negligent acts occurring prior to his conception." The court adopted a line of reasoning similar to the Illinois Supreme Court in *Renslow*. "[T]he *case law on prenatal injuries is the best available means of predicting the rule* which the Missouri courts would apply to *claims for preconception injuries.* This case law shows that, . . . the Missouri Supreme Court has chosen to recognize a cause of action, has refused to be bound by outmoded common law and has declined to allow an injury to be suffered without a remedy. After considering this case law, we agree with the District Court that the courts of Missouri would permit an infant, born alive, to bring an action for injuries arising out of preconception negligent conduct." (*Bergstreser* v. *Mitchell, supra,* 577 F.2d 22, 25, italics added.)

So once again an opinion on which the California Supreme Court relied in *Turpin* announces a rule which speaks of "preconception negligent conduct" in broad terms, not "preconception malpractice" or "preconception conduct of the type involved in this case." And, once again, the opinion reasons the same rule should apply in the same situations for preconception injuries as for prenatal injuries.

The logic of these opinions is inescapable and applies directly to the instant case. These courts emphasize it is difficult to conjure any independent policy reasons for granting recovery to the existing fetus but denying it to the postconceived fetus. Consequently, foreseeability is the touchstone in deciding whether a duty exists. If it is foreseeable a woman injured in a traffic accident will be carrying an embryo or fetus, perhaps unknown even to her at the time, who might be injured subsequently because of damage done to the mother's reproductive capacity in that accident, it also is foreseeable that a woman, similarly damaged in her reproductive capacity, will later conceive a fetus who will suffer like injuries. Under California law, a duty exists toward fetuses in ordinary negligence situations—such as automobile collisions. (*Scott* v. *McPheeters, supra,* 33 Cal.App.2d 629.) Consequently, a duty exists in those same situations toward later-conceived children. The California Supreme Court recognized the wisdom of that reasoning in *Renslow* and *Bergstreser* and announced it as a rule in *Turpin*.

It is noteworthy the California Supreme Court cited *Renslow* and *Bergstreser* with approval, and not the contrary authority which existed at the time *Turpin* was decided, *Albala* v. *City of New York* (1981) 54 N.Y.2d 269 [445 N.Y.S.2d 108, 429 N.E.2d 786], an opinion upon which respondents

and the majority opinion rely so heavily.[1] Significantly, *Albala* likewise arose in a medical malpractice context. Thus, it lends no support for a distinction based on whether the tortfeasor is a medical practitioner rather than an automobile owner or driver.

Instead, the majority in the *Albala* decision simply took the opposite position from Illinois, California and the Eighth Circuit and held tortfeasors in general owe no duty to postconceived children. The majority conceded it was "foreseeable that [the mother] would again conceive and that the health of children born thereafter could be adversely affected by damage to her uterus." But it alluded to vague but sensitive "policy issues" which militated against imposing a duty on tortfeasors toward postconceived children. These policy issues boiled down to only two: first, the typical "the sky is falling" argument traditionally leveled against any and all expansions of tort liability and, second, concerns about "the undesirable impact of encouraging the practice of 'defensive medicine'." (429 N.E.2d at p. 788.) It probably was the lack of substance in the New York court's policy analysis which led Prosser and Keeton to characterize *Albala* as a "thinly reasoned case." (Prosser & Keeton, The Law of Torts (5th ed. 1984) § 55, p. 369, fn. 27.)

In any event, the "sky is falling" argument carried little weight with the *Renslow* and *Bergstreser* courts, and presumably not with the California Supreme Court when it chose to rely on these cases and not *Albala* in *Turpin*. As to the "defensive medicine" concern, that issue is not presented at all in the instant case since it involves negligent driving and not negligent medical treatment. There may be reason to be worried about the economic costs of too much "defensive medicine." But I seriously doubt many would be unhappy if imposing a duty toward postconceived children somehow led to

---

[1]The California Supreme Court obviously chose its authorities for this holding very carefully. It also avoided mentioning *Jorgensen* v. *Meade Johnson Laboratories, Inc.* (10th Cir. 1973) 483 F.2d 237 despite the fact this case frequently is mentioned as supporting the proposition postconceived children can recover for tortious acts which injure their mothers. A careful reading of the opinion reveals it merely acknowledges a defective product may give rise to a cause of action in strict liability even for children who were conceived after the product was manufactured but are harmed by it while in the womb. "If . . . tortious conduct occurring prior to conception is not actionable in behalf of an infant ultimately injured by the wrong, then an infant suffering personal injury from a defective food product, manufactured before his conception, would be without a remedy." (*Id.* at p. 240.)

Unlike the broad rule and expansive rationale announced in the two opinions the California Supreme Court chose to cite, *Renslow* and *Bergstreser*, the *Jorgensen* court expressly limited its holding and its rationale to product liability cases based on a strict liability theory. By choosing to mention only *Renslow* and *Bergstreser*, and to disregard the contrary authority of *Albala* and the limiting authority of *Jorgensen*, the California Supreme Court evidenced it was adopting the rule and rationale of *Renslow* and *Bergstreser* which apply with equal force to all negligence actions.

an increase in "defensive driving" on our crowded, dangerous streets and freeways.[2]

Based on my analysis of the California Supreme Court decision in *Turpin v. Sortini,* and the cases on which it relies, I conclude our high court placed California squarely among the jurisdictions which impose a duty on tortfeasors toward postconceived children.[3] Furthermore, I find nothing in *Turpin* or the out-of-state cases it cited with approval suggesting this duty is imposed solely on medical practitioners or manufacturers of drugs and similar products. Thus, I determine the duty applies to tortfeasors in general and already has been extended to postconceived children. Thus, the trial court erred when it ruled it *would be* an "unwarranted extension of liability." Not only is it not unwarranted it has already happened. Consequently, the trial court's finding the respondents owed no duty to appellant and the demurrer based on that finding should be reversed under principles of stare decisis. (*Auto Equity Sales* v. *Superior Court* (1962) 57 Cal.2d 450.)

---

[2]The briefs also discuss other out-of-state cases decided after the California Supreme Court ruling in *Turpin* and thus having no direct bearing on our interpretation of the present law in California. Nevertheless, they are worthy of mention. In *McAuley* v. *Wills* (1983) 251 Ga.3 [303 S.E.2d 3], an automobile accident case, the Georgia Supreme Court acknowledged "at least in some situations, a person should be under a duty of care toward an unconceived child," but held under the undisputed facts of that case there was an unforeseeable intervening act which meant "the defendant's negligence was not the proximate cause of the plaintiff's injury." The unforeseeable intervening act was the physician's malpractice while delivering the plaintiff infant to the paraplegic mother. (This contrasts with the instant case where under the allegations of the complaint the plaintiff's injuries resulted from the fact defendant's negligent harm to the mother meant the infant had to be delivered prematurely, not from any malpractice in the manner of her delivery.) In *Monusko* v. *Postle* (1989) 175 Mich.App. 269 [437 N.W.2d 367], the court expressly rejected the reasoning of *Albala* and allowed a postconceived child a cause of action against medical practitioners who failed to test or immunize her mother against rubella. The mother caught rubella during pregnancy and the plaintiff was born with severe handicaps. Finally, in *Enright* v. *Eli Lilly* (1991) 77 N.Y.2d 377 [568 N.Y.S.2d 550, 570 N.E.2d 198], the New York Court of Appeals predictably followed its *Albala* decision and denied a cause of action to the *grand*daughter of a woman who ingested the drug DES and allegedly suffered premature birth and its consequences as a result.

[3]Although not determinative, I also note this view is shared not only by the California Supreme Court and the majority of courts which have spoken to this issue but is also supported by the overwhelming majority of commentators, including the leading scholars in the field of tort law—Prosser & Keeton. (Prosser and Keeton, The Law of Torts, *supra*, § 55 and 3 Harper et al., The Law of Torts (2d ed. 1986) § 18.3.) Other authorities supporting the principle that tortfeasors should owe a duty to postconceived children include Case and Comment, *Report of the Scottish Law Commission on Antenatal Injury,* (1974) Jr. Rev. 83; Gordon, *The Unborn Plaintiff* (1965) 63 Mich. L. Rev. 579; Note, *Torts Prior to Conception: A New Theory of Liability* (1977) 56 Neb.L.Rev. 706; Robertson, *Toward Rational Boundaries of Tort Liability for Injury to the Unborn: Prenatal Injuries, Preconception Injuries and Wrongful Life* (1978) Duke L.J. 1401; Comment, *A Step Backward for the Infant Plaintiff in Preconception Tort Actions: Albala* v. *City of New York* (1982) 15 Conn. L. Rev. 161; Comment, *Preconception Tort as a Basis for Recovery* (1982) 60 Wash. U.L.Q. 275; and Note, *Torts-Preconception-Infant's Right to Cause of Action* (1982) 50 Tenn. L. Rev. 195.

## II. If This Were an Issue of First Impression, Under the Criteria Announced in Rowland v. Christian Tortfeasors Like Respondent Owe a Duty of Care to Children Conceived After the Tortious Act Is Committed Against Their Mothers

As discussed above, the California Supreme Court already has considered the duty question which is the only issue on appeal in this case. Under principles of stare decisis I conclude this appellate court is bound by the higher court's resolution of that question. Nonetheless, as an independent and sufficient grounds for my opinion in this case and in further support of the Supreme Court's holding on this issue, I have applied general principles of California tort law and determined it is appropriate to impose a duty on tortfeasors like respondent toward postconceived children.

### A. The Proper Analysis of the Facts of This Case Is Under Rowland v. Christian

On the issue of duty, California has "repeatedly eschewed overly rigid common law formulations . . . in favor of allowing compensation for foreseeable injuries caused by a defendant's want of ordinary care." (*J'Aire Corp.* v. *Gregory* (1979) 24 Cal.3d 799, 805 [157 Cal.Rptr. 407, 598 P.2d 60].) Thus in *Rowland* v. *Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] the California Supreme Court adopted, as a general principle, the concept contained in section 1714 of the California Civil Code which reads in part: "Every one is responsible . . . for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person." While the facts of the *Rowland* case concerned the liability of the possessor of property to a licensee, the rule enunciated in *Rowland* has been applied in diverse factual contexts. (See, e.g., *J'Aire Corp.* v. *Gregory, supra,* 24 Cal.3d 799 [contractor owes a duty of care to tenant of building undergoing construction work to prevent foreseeable economic injury to tenant's business]; *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166] [therapist owes a duty of care to third persons who may foreseeably be harmed by patient]; *George A. Hormel & Co.* v. *Maez* (1979) 92 Cal.App.3d 963 [155 Cal.Rptr. 337] [automobile driver owes a duty of care to factory for economic damages due to electrical outage caused by vehicle striking a power pole]; *Curlender* v. *Bio-Science Laboratories, supra,* (1980) 106 Cal.App.3d 811 [medical laboratory owes a duty of care to child born after the laboratory failed to warn the child's parents of the likelihood of child being born with genetic disorder].)

The court in *Rowland* made clear their intention that this rule be broadly applied by declaring: "[a]lthough it is true that some exceptions have been

made to the general principle that a person is liable for injuries caused by his failure to exercise reasonable care in the circumstances, . . . in the absence of [contrary] statutory provision[s] . . . no such exception should be made unless clearly supported by public policy." (*Rowland* v. *Christian, supra,* 69 Cal.2d at p. 112.) Hence, under California law there is a presumption that all citizens owe a duty to exercise reasonable care in their actions which, in the circumstances, might pose the danger of injury to the person or property of others. This presumption may be overcome only if clearly mandated by considerations of public policy or by statute.[4]

---

[4]The idea, espoused by the court in *Rowland,* of a presumptive duty of care finds additional support in the various economic analyses of tort law. (See, e.g., Demsetz, *When Does the Rule of Liability Matter?* (1972) 1 J. Legal Stud. 13; see also Landes & Posner, *Causation in Tort Law: An Economic Approach* (1983) 12 J. Legal Stud. 109; Posner, Economic Analysis of the Law (3d ed. 1986) p. 187.) Economic analysis limits it focus to a single societal value—economic efficiency—rather than the full scope of values embraced in *Rowland.* Nonetheless, it is an important value and one worth weighing when deciding the overall merits of a given common law legal rule.

In one such analysis Judge Posner stated as a general rule: "[a] defendant owes to those whom he might chance upon and injure a duty to exercise due care." (Posner, *A Theory of Negligence* (1972) 1 J. Legal Stud. 29, 38.) The unqualified nature of this statement is justified by an examination of negligence law from a cost/benefit perspective.

Most proponents of the economic approach to negligence use as a starting point the formulation of the negligence standard provided by Judge Learned Hand in *United States* v. *Carroll Towing Co.* (2d Cir. 1947) 159 F.2d 169. In a negligence case, according to Hand, the judge or jury should attempt to measure three things: the magnitude of the loss if an accident occurs (L), the probability of an accident occurring (P), and the economic burden of taking precautions to prevent the accident (B). (See, e.g., Posner, *A Theory of Negligence, supra,* 1 J. Legal Stud. 29.) If B is less than P times L, then the failure to take those precautions is negligence. By corollary, "[i]f the cost of safety measures or curtailment—whichever cost is lower—exceeds the benefit in accident avoidance to be gained by incurring that cost, society would be better off, in economic terms, to forgo accident prevention." (*Id.* at p. 32.)

Because the economic purpose of tort law is to assure the most efficient level of care at the least possible expense, *all* the effects of a person's actions, even unintended ones, must be accounted for in determining quantities for B, P, and L in the negligence equation. Only when these values accurately reflect the true cost of an accident, the precautions necessary to avoid it, and the actual probability of it occurring may a realistic efficiency assessment be made. In other words, to deny recovery to *anyone* a tortfeasor injures—including postconceived children—artificially reduces the "L" factor (the cost of the accident) and thus distorts the equation in such a way the tortfeasor will have an insufficient incentive to make adequate investments in accident avoidance. This principle is illustrated by Posner in justifying the imposition of liability on a defendant for injuries inflicted on a plaintiff with an "eggshell skull." The issue in such a case is not whether the defendant owes a duty of care to the plaintiff, since a duty is presumed. Rather, the question is whether he should be held liable for the full extent of damages even though the extent could not be foreseen. According to Posner:

"[T]here is a good reason for distinguishing . . . between the fact of injury and its extent. *We want the total liability of negligent injurers to equal the total cost of their accidents.* If instead of attempting to determine damages in each case on an individual basis, we used an average figure (the injury [an average man] . . . would have sustained in an accident of the same type), then we would be overcompensating some (those who are stronger or healthier than average), as well as undercompensating the weaker. But overcompensating for injuries

To aid in the determination of when public policy might demand a departure from this principle, the *Rowland* court set out a number of factors to be balanced. These factors are: the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care, and the availability, cost and prevalence of insurance for the risk involved. (*Id.* at pp. 112-113.)

While this list of factors is appropriate for the majority of negligence suits it is not, nor was it intended to be, exhaustive for all cases involving alleged negligence. Thus, in *Borer* v. *American Airlines, Inc.* (1977) 19 Cal.3d 441 [138 Cal.Rptr. 302, 563 P.2d 858], the court declined to recognize a cause of action for loss of parental consortium, citing reasons of social policy. The *Borer* court was concerned with the possibility of an uncontrolled expansion of liability, pointing to the intangible nature of the loss in such an action, the difficulty of measuring damages for such a loss, and the fact no American jurisdiction then permitted a child to sue for loss of parental consortium. The court justified adding these considerations to the liability analysis because unlike *Rowland*, the *Borer* case involved the creation of a new cause of action for solely intangible damages.

In *Thing* v. *La Chusa* (1989) 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814], the California Supreme Court again found the *Rowland* factors inconclusive in determining liability, this time in an action for negligent infliction of emotional distress (NIED). As in *Borer*, the court noted injuries in such a case are intangible, and "[r]ecovery for this type of damage, *when no other injury is present*, has never been subject only to the general principles of foreseeability applied in *Rowland* v. *Christian*." (*Thing* v. *La Chusa, supra,* 48 Cal.3d 644, 668, fn. 10, italics added.) However, notwithstanding the fact

---

may cause the accident rate to rise. Insurance companies will not insure a building for more than it is worth lest arson be encouraged. Nor should the law of negligence encourage the strong to court injury by overcompensating them when an injury occurs. But then *the weak must not be undercompensated, lest the total liability of negligent injurers fall short of the total cost of their accidents.*" (Posner, *A Theory of Negligence, supra,* 1 J. Legal Stud. 29, pp. 47-48, italics added.)

The same principle applies to the issue of duty. In order to ensure the social costs of an accident are minimized (and efficiency is maximized) it is necessary that all the consequences of the injurer's actions be factored into the calculus. (In economic terms, all externalities must be internalized.) Accordingly, a person driving an automobile should owe a duty to, and thus be responsible for the costs of injuries to, anyone whose injuries are proximately caused through the negligent handling of his automobile. But that duty should not extend to those whose injuries did not proximately result from his negligence. For, if the damage was not caused by the defendant's actions, the assessment of B, P, and L in the Hand equation will be inaccurate, and the calculated cost of accidents will be overestimated.

that other considerations are present in an action for NIED, such a cause of action has been recognized in California since 1968. (See *Dillon v. Legg* (1968) 68 Cal.2d 728 [69 Cal.Rptr. 72, 441 P.2d 912, 29 A.L.R.3d 1316].) Importantly, the *Thing* court's recognition that other policy considerations were necessary to restrict the possibility of unlimited liability in NIED actions led the court to restrict and enumerate the class of plaintiffs who could bring such an action as a matter of law. (*Thing v. La Chusa, supra,* 48 Cal.3d at p. 668, fn. 10.)

By contrast, the present case involves none of the dangers of expanded liability which were present in *Borer* or *Thing*, and thus a judicial restriction of the plaintiff class such as is seen in the latter case is both unnecessary and inappropriate. Despite its initial appearance, this case is nothing more or less than a personal injury suit—Cassondra Hegyes alleges a tangible injury caused by the respondents' negligence. This is not a wrongful life case, in which the alleged injury is that, but for the defendant's negligence, the plaintiff would not have been born at all.[5] Nor is this really a prenatal injury case, since Cassondra's respiratory condition did not exist *in utero* but only became manifest after her premature birth. Analytically however, this case is similar to the prenatal injury cases, where "*as in a typical personal injury case,* the defendant . . . has interfered with the child's basic right to be free from physical injury caused by the negligence of others." (*Turpin v. Sortini, supra,* 31 Cal.3d 220, 231, italics added.)

Since the facts of the present case are essentially those of a typical personal injury suit, it does not require the recognition of a new cause of action for us to assess the sufficiency of the appellant's complaint. Nor should the fact that Cassondra was not conceived at the time the tort was committed distract us from the observation that there is little danger of an endless expansion of liability in such a case—the alleged injury is not one with potential multigenerational effects, such as are found in the DES cases and ones involving radiation exposure. Because the injury alleged is a tangible one, the calculation of damages is no more difficult than in any other personal injury case. Thus, none of the policy reasons cited in *Borer* or *Thing* which necessitated the consideration of factors additional to those mentioned in *Rowland v. Christian* exist in this case, and I need not use them in the analysis.

---

[5] I note despite the difficulty of assessing damages in such a case, California recognizes a cause of action for wrongful life. (*Curlender v. Bio-Science Laboratories, supra,* 106 Cal.App.3d 811; see also *Turpin v. Sortini, supra,* 31 Cal.3d 220.)

B. *Application of the Rowland Factors to the Facts of the Present Case*

1. *Foreseeability of Harm to Cassondra Hegyes*

The California Supreme Court has stated that foreseeability of the risk is a primary consideration in establishing the element of duty. (*Weirum* v. *RKO General, Inc.* (1975) 15 Cal.3d 40, 46 [123 Cal.Rptr. 468, 539 P.2d 36].) However, foreseeability is not only a consideration in the court's willingness to find the existence of a duty, but is also to be assessed by the trier of fact in the determination whether the specific injury in issue was foreseeable. (*Thing* v. *La Chusa, supra*, 48 Cal.3d at p. 654, fn. 3.) Thus, "a court's task—in determining duty—is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced." (*Ballard* v. *Uribe* (1986) 41 Cal.3d 564, 572-573, fn. 6[,] italics in original.) It is the province of the jury, by contrast, to conduct a fact-based inquiry into whether the particular defendant's conduct was negligent at all, and, if so, whether it was a proximate cause of the plaintiff's injury. (*Ibid.*, see also 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 967 pp. 356-357.)[6] This is borne out by the California Supreme Court's opinion in *Weirum* v. *RKO General, Inc., supra*, 15 Cal.3d 40 [123 Cal.Rptr. 468, 539 P.2d 36]. The court affirmed a lower court's ruling that a radio station was liable for the wrongful death of a motorist forced off the road by youthful listeners participating in a promotional contest. Although the radio station was not particularly aware of the decedent's existence, as a user of the public streets and highways the decedent was nevertheless of a class of persons to which an unreasonable risk of harm was foreseeably created by the nature of the radio broadcast. Moreover, the court held, "'[t]he mere fact that a particular kind of an accident has not happened before does not . . . show that such accident is one which might not reasonably have been anticipated.'" (*Id.* at p. 47, citing *Ridley* v. *Grifall Trucking Co.* (1955) 136 Cal.App.2d 682, 686 [289 P.2d 31].)

Hence, in *Weirum* the court upheld the jury's finding that it was reasonably foreseeable to the radio station that a driver might be injured or killed as a proximate result of the station's contest format. In so doing, the court implicitly affirmed the trial court's finding that the risk created by a radio station's negligent broadcast was sufficiently likely to result in injuries due to an automobile accident as to place a duty of care on such radio stations towards the general public. The findings of the jury based on the evidence

---

[6]It is interesting to note a rule such as that expounded in *Ballard* finds support in the economic analysis of tort law. (See fn. 4, *ante*.)

presented at trial that the plaintiff's injuries were foreseeable in light of the particular broadcast at issue was a matter of fact, and not the province of the court. (*Weirum* v. *RKO General, Inc., supra,* 15 Cal.3d 40, 46.)

Applying these principles to our analysis of the present case, we must ask whether negligent operation of a motor vehicle is sufficiently likely to cause injury to an infant resulting from its premature birth. An affirmative answer to this question weighs against overcoming the presumption of the existence of duty set out in *Rowland* v. *Christian.*

This is the appropriate question to ask, since the "category of negligent conduct" at issue is an alleged lack of reasonable care in the operation of a motor vehicle, and the "kind of harm experienced" was the respiratory condition suffered by appellant. The fact that Cassondra Hegyes was not yet born at the time of the tortious conduct is outside the scope of the court's analysis; if the condition she suffers from was sufficiently likely to result from negligent driving, a duty exists, and an inquiry questioning whether *this* plaintiff would have been foreseeably injured by *this* defendant must be determined by the jury as an element of proximate cause.

"The great majority of respiratory infections [in children] occur" in premature infants. (5 Lawyer's Medical Cyclopedia of Personal Injuries & Allied Specialties (3d ed. 1986) § 37.24b, p. 106.) Moreover, there is a 10-fold increase in the death rate in premature infants as compared to full-term infants, and there is a corresponding increase in the rate of serious complications in such infants who survive premature birth; "[t]hey are prone especially to pulmonary infections and brain hemorrhage." (*Id.* at § 37.17, p. 81.) Thus, it is reasonably foreseeable that premature birth would give rise to a serious injury similar to the one suffered by the appellant in the present case.

Also, it is also reasonably foreseeable that a pregnant woman would be a driver, passenger, or pedestrian who could be affected by an automobile operator's failure to drive with reasonable care. Since this is the case, under California law any injury to the woman's unborn infant would give rise to a valid cause of action on behalf of the infant for personal injuries sustained prior to birth. (See *Scott* v. *McPheeters, supra,* 33 Cal.App.2d 629.)

Having established that premature birth is reasonably likely to give rise to the "kind of harm experienced" by the appellant in this case, and that it is foreseeable that the class of persons to whom the plaintiff belongs would be affected by a negligent driver, the last question must be: is it reasonably foreseeable that a woman would suffer injuries in an automobile accident which would result in the premature birth of her child?

Premature birth may result from premature labor or any of a variety of threats to maternal or fetal health which may require a physician-mediated premature delivery of the child, either by induced labor, or by Caesarean section. With regard to premature labor, in most cases the cause of the condition is unknown; it occurs, however, in 7 to 8 percent of all deliveries. (5 Lawyer's Medical Cyclopedia, *supra*, § 37.17 at p. 81.) Trauma, either physical or emotional, has been found in some cases to be related to the time of premature labor, but "these factors are [considered] . . . extremely uncommon and are far outnumbered by natural causes." (*Ibid.*) Nevertheless, due to maternal anxiety, many women are apt to attribute premature labor to such trauma.

Alternatively, an infant's premature birth may be due to maternal or fetal injury which necessitates an early delivery. For example, a pregnant woman may be gravely injured or killed, and the infant will be delivered prematurely, if it is viable, in order to save its life. Or the fetus may be injured in the mother's womb, and an early delivery is necessary to save its life through surgery.

A premature delivery due to either of the causes mentioned above is reasonably foreseeable. In the first situation, while the induction of premature labor by trauma is uncommon, it nevertheless occurs. (See, e.g., *Drobner* v. *Peters* (1921) 232 N.Y. 220 [133 N.E. 567, 20 A.L.R. 1503] [child born prematurely with serious injuries 11 days after mother fell into an open coal chute].) Moreover, the foreseeability of a risk does not turn exclusively on the likelihood of harm, but must take into consideration the reasonable person's perception of the risk. Death due to an airplane crash is statistically unlikely, but is nevertheless reasonably foreseeable. Hence, simply because the public perception is that physical trauma may induce premature labor more often than it actually occurs does not make such an event unforeseeable.

The likelihood of grave injury or death as a result of an automobile accident caused by another's negligence is clearly foreseeable. It is also foreseeable that an injury to a pregnant woman would be to a part of her body which does not immediately harm the fetus. In such an event, assuming the fetus is viable, it would be standard medical procedure to deliver the fetus prematurely to ensure its survival.

I therefore find that it is sufficiently likely the negligent operation of a motor vehicle would give rise to the "kind of injuries experienced" by the appellant in this case. Hence, under the foreseeability prong of the *Rowland* v. *Christian* analysis, I find nothing to overcome the presumption respondent owed the infant appellant a duty of reasonable care.

## 2. *Certainty of Injury to Cassondra Hegyes*

Similarly, there is no question that Cassondra Hegyes was injured. While premature birth in itself is no injury, attendant respiratory conditions in premature infants are potentially life-threatening. (See, e.g., *Pan-American Casualty Co.* v. *Reed* (5th Cir. 1957) 240 F.2d. 336; see also generally, 5 Lawyer's Medical Cyclopedia, *supra*, §§ 37.16-37.17 at pp. 79-82.) Moreover, such injuries are often permanent or may require lengthy treatment or surgery to remedy. Hence, there can be no doubt that Cassondra has in fact suffered a very real injury.

## 3. *The Closeness of the Connection Between Respondent's Conduct and Appellant's Injury*

The closeness of the connection between the defendant's conduct and the plaintiff's injury, both directly and proximately, is generally a question of fact for the jury. (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 967 pp. 356-357.) Since this case is before us on a demurrer, we may only rule on the sufficiency of the complaint as a matter of law. Thus, the jury indeed may determine the connection between the respondent's allegedly negligent driving and Cassondra Hegyes's injuries to be too attenuated because of intervening causes not apparent in the complaint. However, if a duty exists and the traditional elements of negligence, duty, breach, causation, and injury are properly pleaded, then appellant must be given her day in court to attempt to prove her case.

For the reasons stated above under the discussion of foreseeability, I do not think it possible to declare the connection between act and injury in this case is too attenuated as a matter of law. Indeed it is difficult to discern a relevant difference in closeness between the situation where a driver's conduct injures a one-day pregnant mother in such a way she ultimately delivers a disabled child and one where the same conduct injures a woman who later conceives a child doomed to the same fate for the same reason.

## 4. *The Degree of Moral Blame to Be Attached to the Appellant's Alleged Conduct*

A motor vehicle is a powerful engine of destruction unless handled with great care and responsibility. For this reason, the law regards operating a motor vehicle to be a privilege. A driver's license is required especially so the only persons allowed to drive a car on public streets are those who have demonstrated they can operate an automobile safely and with reasonable care. The purpose of this requirement is an attempt to ensure the public safety and prevent injury to the driver and others. Thus, one who fails to

observe the standards necessary to accomplish this goal is putting his own and innocent lives at risk. Significant moral blame must inevitably attach one who operates something so dangerous to life and limb in a careless manner.

Assuming the truth of appellant's allegations the respondent failed to exercise ordinary care in the operation of a motor vehicle, and this failure resulted in appellant's injuries, an additional measure of moral blame attaches to respondent's conduct. I agree with the *Renslow* court, "there is a right to be born free from prenatal injuries foreseeably caused by a breach of duty to the child's mother." (*Renslow, supra,* 367 N.E.2d at p. 1255.) A person who interferes with this right wrongfully deprives the infant of the opportunity to begin life free of injuries which would not have had existed but for the actor's tortious conduct. Cassondra's premature birth and resulting respiratory problems must be taken to have constituted serious injury to one who had no choice but to incur the one, and who may never experience life without the other. Thus, at least as much moral blame attaches to respondent's conduct in this case as in that of any other automobile negligence case which seriously injures someone.

### 5. *The Policy of Preventing Future Harm*

There is, of course, nothing lost and everything to be gained from encouraging motorists to exercise reasonable care while driving. There already exists a strong public policy in favor of preventing injury due to negligent operation of a motor vehicle. To the extent a finding of liability in this case would encourage automobile operators to act with even greater care, the policy of preventing future harm to victims of automobile accidents, including postconceived children, would be advanced by such a finding.

### 6. *The Extent of the Burden to the Defendant and the Consequences to the Community of Imposing a Duty to Exercise Reasonable Care While Driving*

Neither the current respondents nor the community as a whole would be excessively burdened by a finding automobile operators owe a duty to children conceived after a tort is committed against their mother. Indeed the consequences for the community, if any, would be entirely positive.

Automobile drivers already have a duty to exercise ordinary care under the circumstances towards other drivers, passengers and pedestrians they may encounter. Yet our streets and highways still witness far too many deaths and injuries. Any extra burden placed on drivers by making them responsible to postconceived children—and it seems unlikely to be a

significant burden—would only serve to increase the degree of care drivers must exercise. I seriously doubt many would contend the present burden is so heavy and drivers already are so careful we should not increase the burden or enhance the degree of care any further than we already have. As for the community at large, the consequences, at worst and at best, would be fewer automobile accidents and thus fewer deaths and injuries. This would be a welcome—not an unfortunate—consequence.

Realistically, however, recognizing drivers have a duty toward postconceived children is unlikely to impose a significant new burden on the driving population nor achieve a significant improvement in the standard of care exhibited on our streets and highways. Compared to the millions of people toward whom drivers already owe a duty of care, the handful of postconceived children whose injuries they might proximately cause represent an infinitesimal increment—like a single sliver of straw dropped on a haystack.

### 7. The Availability, Cost, and Prevalence of Insurance for the Risk of Injury to Postconceived Children

Not only is automobile insurance available and prevalent, it is required by state law. The risk is thus readily insurable. While the cost of insurance could significantly rise if there were a dramatic increase in the number of suits brought by postconceived children against negligent drivers, no such flood is likely. It seems extraordinarily improbable automobile accidents will injure enough women in such a way it causes injuries to their postconceived children to warrant an appreciable rise in the cost of automobile insurance.

### 8. Balancing the Factors

Upon balancing these factors I find the facts of the instant case do not warrant an exception to the general rule stated in *Rowland*, as a matter of law. I find the kind of injury alleged by appellant in this case is a reasonably foreseeable result of the respondents' alleged negligent driving. Because the complaint avers a tangible, certain injury, the fact of the injury as pleaded is not in doubt. Respondents' alleged activity carries a heavy measure of moral blame. The public policy of preventing injury due to automobile accidents is furthered by imposition of a duty of care on drivers to prevent injury to postconceived children. (See the economic analysis of these public policy considerations in fn. 4, *ante.*) Since the standard of care which drivers must exercise to prevent such injury is the standard which already exists towards other motorists and pedestrians, neither the respondent nor the public is burdened by the finding of a such a duty. Indeed, to the extent the burden is

increased so is the incentive to drive safely which would represent a benefit not a burden for the public. Finally, insuring drivers against harm caused by automobile accidents is one of the main functions of insurance in our society today and is required to be purchased by every California driver. There is no reason to believe the cost of automobile insurance would rise appreciably—if at all—were we to recognize drivers owed a duty toward postconceived children.

Only on the issue of the closeness of the connection between the respondent's conduct and the appellant's injury do I see issues of fact which may eventually foreclose a finding of liability in this specific case. Should the finder of fact determine appellant's injuries were not directly or proximately caused by respondent's conduct, there, of course, would be no basis for liability. This, however, is to be determined on the evidence presented by the parties below. It is an issue for the fact finder in the trial court not an issue of law to be decided on appeal.

Accordingly, on grounds of both stare decisis and application of well-settled principles for analyzing the duty issue under California law I conclude tortfeasors—including automobile drivers—owe a duty of due care which extends to postconceived children whose injuries are the proximate result of the tortfeasors' acts. Having answered the sole issue presented on the appeal in this way, I would remand for further proceedings which might or might not establish the requisite causal connection.

A petition for a rehearing was denied October 23, 1991, and appellant's petition for review by the Supreme Court was denied January 16, 1992. Mosk, J., was of the opinion that the petition should be granted.